State ex rel. West, Att'y Gen., v. Farmers' Nat. Bank of Cushing.

is just and reasonable has been overcome, and same is, therefore, affirmed.

All the Justices concur.

---

## STATE *ex rel.* WEST, *Atty. Gen.*, v. FARMERS' NAT. BANK OF CUSHING.

No. 5823.    Opinion Filed June 22, 1915.

(150 Pac. 212.)

1. **BANKS AND BANKING—State Banks—Assessment for Guaranty Fund.** Section 3 of the act of March 11, 1909 (Sess. Laws 1909, pp. 121-123), created a depositors' guaranty fund for the immediate and continuous protection of depositors in state banks, in a fixed and invariable sum, to wit, in an amount equal to 5 per centum of the average daily deposits in all state banks, and an assessment therefor was thereby levied against each state bank, organized and doing business under the state banking law, and the amount thereof became a fixed, present liability.

2. **SAME—State Bank Converted into National Bank—Effect on Liabilities.** A state bank, by converting into a national bank, places itself beyond state control and ceases to exist as a state corporation, but does not thereby escape liabilities incurred by it during its continuance as a state bank.

3. **SAME.** The effect of a state bank surrendering its charter and organizing as a national bank, under the United States banking laws, is not to mature or discharge the deferred payments of the assessment levied under section 3 of the act of March 11, 1909.

(Syllabus by the Court.)

Kane, C. J., and Sharp, J., dissenting.

*Error from District Court, Payne County;*

*A. H. Huston, Judge.*

Action by the State, on the relation of Chas. West, Attorney General, against the Farmers' National Bank of Cushing. Judgment for plaintiff for less than claimed, and plaintiff brings error. Affirmed.

State ex rel. West, Att'y Gen., v. Farmers' Nat. Bank of Cushing.

*S. P. Freeling,* Atty. Gen., and *Joseph L. Hull, H. H. Hagan,* and *John B. Harrison,* Asst. Attys. Gen., for plaintiff in error.

*John H. Burford, Frank B. Burford, Thomas A. Higgins,* and *Cottingham & Hayes,* for defendant in error.

*Stuart, Cruce & Cruce, amici curiae* (on behalf of plaintiff in error).

*Ames, Chambers, Lowe & Richardson* and *Burwell, Crockett & Johnson, amici curiae* (on behalf of defendant in error).

GALBRAITH, Special Judge.   This appeal is prosecuted to review the judgment of the trial court rendered upon motion for judgment on the pleadings (the petition and answer) in an action instituted by the Attorney General of the state against the defendant in error to recover the balance alleged to be due on the assessment made against the capital stock of the Farmers' State Bank of Cushing for the benefit of the bank guaranty fund.   It was admitted that the Farmers' State Bank was organized and authorized to do business as a state bank, under the laws of Oklahoma, on the 28th day of January, 1910, and that it continued in business as a state bank until the 3d day of March, 1913, when it surrendered its charter and organized under the banking laws of the United States as the Farmers' National Bank of Cushing, and has since continued as a national bank; that its average daily deposits during the time it existed as a state bank were $44,819.50, and that 5 per cent. assessment of that amount would be $2,240.97, and that of this amount $548.46 has been paid into the bank guaranty fund, and that the balance due said fund on the 3d day of March, 1913, was $128.80.   The bank, in its answer, acknowledged this latter amount to be due and tendered the same, and offered to confess judgment in that amount.   The trial court ren-

dered judgment against it in the sum of $128.80. From this judgment, the Attorney General has appealed.

The controlling question in this case arises upon the construction of the statute providing for the "depositors' guaranty fund," under which the Cushing State Bank was organized and authorized to do business as a state bank. It is the contention of the Attorney General that this statute made an assessment against the bank of 5 per cent. of its average daily deposits, and that this was a present, existing obligation from the date of the organization of the bank, and that, when the bank nationalized in March, 1913, the entire balance of the amount of 5 per cent. assessment that had not been paid at that time then matured and became due and payable. On the other hand, it is contended on behalf of the bank that the 5 per cent. assessment did not create a present obligation of the bank for the entire amount, but for only 1 per cent. of the amount for the first year and one-fourth of 1 per cent. for each year thereafter, while it continued to do business as a state bank, and that, when the bank nationalized and ceased to do business under the state banking law, it was then relieved of liability of any further part of such asessment. Necessarily the controlling question in this case is: Did section 3 of the act of March 11, 1909, make a levy of 5 per cent. assessment *in praesenti* and create an obligation from the date of the organization of the bank under that law. This statute reads as follows:

"Sec. 3. Section two (2) of article two (2) of chapter six (6) of the Session Laws of Oklahoma nineteen hundred seven and eight, be and the same is hereby amended to read as follows: There is hereby levied an assessment against the capital stock of each and every bank and trust company organized or existing under the laws of this state for the purpose of creating a depositors' guaranty fund equal to five (5) per centum of its average daily deposits during its continuance in business as a banking corporation. Said assessments shall be payable one-fifth

during the first year and one-twentieth during each year thereafter until the total amount of said five (5) per centum assessment shall have been fully paid: Provided, however, that the assessments heretofore levied and paid by banking corporations or trust companies now existing shall be deducted from and credited as a payment on said five (5) per centum assessment hereby levied. The average daily deposits of each bank during the preceding year prior to the passage and approval of this act shall be taken as the basis for computing the amount of the first payment on the levy hereby made. One year after the passage and approval of this act, and annually thereafter, each bank and trust company doing business under the laws of this state shall report to the bank commissioner the amount of its average, daily deposits for the preceding year, and if such deposits are in excess of the amount upon which the first or subsequent payment of the levy hereby made is computed, each bank or trust company having such increased deposits shall immediately pay into the depositors' guaranty fund a sum sufficient to pay any deficiency on said first or subsequent payment, as shown by such increased deposits. After the five (5) per cent. assessment hereby levied shall have been fully paid up, no additional assessment shall be levied or collected against the capital stock of any such bank or trust company, except emergency assessments hereinafter provided, to pay the depositors of failed banks, and except assessments as may be necessary by reason of increased deposits to maintain such funds at five (5) per centum of the aggregate of all deposits in such banks and trust companies doing business under the laws of this state. Whenever the depositors' guaranty fund shall become impaired or be reduced below * * * five (5) per centum by reason of payments to depositors of failed banks, the state banking board shall have the power, and it shall be their duty, to levy emergency assessments against the capital stock of each bank and trust company doing business in this state sufficient to restore said impairment or reduction below five (5) per cent.; but the aggregate of such emergency assessment shall not in any one calendar year exceed two (2) per centum of the average daily deposits of all such banks and trust companies. If the amount realized from such emergency assessments shall be insufficient to pay off

the depositors of all failed banks having valid claims against said depositors' guaranty fund, the state banking board shall issue and deliver to each depositor having any such unpaid deposit, a certificate of the indebtedness for the amount of his unpaid deposit, bearing six (6) per cent. interest. Such certificate shall be consecutively numbered and shall be payable upon the call of the state banking board in like manner as state warrants are paid by the state treasurer in the order of their issue out of the emergency levy thereafter made; and the state banking board shall from year to year levy emergency assessments hereinbefore provided against the capital stock of all banking corporations and trust companies doing business in this state until all such certificates of indebtedness with the accrued interest thereon shall have been fully paid. As rapidly as the assets of failed banks are liquidated and realized upon by the bank commissioner, the same shall be applied first after the payment of the expense of liquidation to the repayment of the depositors' guaranty fund of all money paid out of said fund to the depositors of such failed bank, and shall be applied by the state banking board towards refunding any emergency assessment levied by reason of the failure of such liquidated bank: Provided, further, that seventy-five per cent. of the depositors' guaranty fund shall be invested for the benefit of said fund in state warrants or such other securities as state funds are now required to be invested."

If there is any doubt as to the meaning of the words used and of the purpose and intent of the Legislature in enacting this amendment to the original bank guaranty law, or of the section thereof providing for the creation of the "depositors' guaranty fund," an examination of the original act may throw light upon such purpose and intent. The original statute was the act of May 26, 1908 (Sess. Laws 1907-8, p. 139). Section 2 thereof reads as follows:

"The state banking board shall levy against the capital stock an assessment of one per cent. of the banks' daily average deposits, less the deposits of the United States, and state funds, if otherwise secured, for the preceding

year, upon each and every bank and trust company organized or existing under the laws of this state, for the purpose of creating a depositors' guaranty fund. Said assessment shall be collected upon call of the state banking board:"

That section also provides that in one year from the time of the levy of the first assessment, and annually thereafter, each bank shall report to the banking board the amount of its average daily deposits for the preceding year, and, if such deposits are in excess of the amount of which 1 per cent. was paid, said report shall be accompanied by additional funds to meet 1 per cent. of its daily average excess, and provides that this excess shall be added to the depositors' guaranty fund, and also provides that, if the guaranty fund is depleted from any cause, it shall be the duty of the banking board to levy special assessments in order to keep this fund up to the amount equal to 1 per cent. of the total deposits in all state banks, and that said special assessment shall become immediately due and payable. It is apparent from this section that it was intended that the guaranty fund should be maintained at all times in an amount equal to 1 per cent. of the total deposits in all state banks.

An examination of section 2 of the act of February 12, 1908, which was repealed by the act of May 26, 1908, will show that the same provision was made in that act for creating the guaranty fund that is provided in the act of May 26th, above set out.

Further light may be thrown upon the purpose and intent of the Legislature in the enactment of section 3 of the Laws of 1909 by a consideration of the amendment to that section found in the Session Laws of 1910-11, pp. 54-56, being section 3 of that act. It will be observed that the principal changes, other than those of punctuation, made by the amendment of 1911, is the denial of the bene-

fits of the act to banks doing a trust business after September 1, 1911, and the substitution for the provision requiring 75 per cent. of the guaranty fund to be invested in state warrants, etc., the requirements that the fund shall be deposited in the banks from which it was collected, and that deposit certificates shall be issued therefor by the bank commissioner, bearing 4 per cent. interest per annum.

The principle involved in the bank guaranty law was old, but its application in the concrete, in Oklahoma, was new, and more or less of an experiment. The frequent amendments to the statute is evidence of this fact. The purpose of the law is obvious. It was intended to establish confidence in state banks among the people generally, and the principal feature intended to aid in the accomplishment of this purpose was the creation of the "depositors' guaranty fund," and, if this fund was to be a guaranty, it must of necessity be sufficient to protect the depositors from loss by reason of bank failures. No one knew, at the time of the enactment of the original statute, how great a fund it would require to accomplish this purpose. It was doubtless considered that the amount of this fund could only be learned by experience. In the original act it was provided that the guaranty fund should be 1 per cent. of the total amount of the bank's average daily deposits. Experience soon demonstrated that this amount was insufficient, and in the amendment of 1909, under consideration, provision was made for making a 5 per cent. levy in lieu of the 1 per cent. Then in the amendment of 1913 the amount of the assessment was reduced from 5 per cent. to 2 per cent. These several amendments and changes in the amount of the levy for creating the guaranty fund were doubtless due to experience, gained from a study of the operation of the law. However, there was one purpose apparent through all the history of this legislation, and that was that the Legislature intended to

create a guaranty fund sufficient, not only to afford protection to depositors of state banks, but also large enough to create and establish confidence in the public generally in the state banking system.

Now, the language used in the amendment under consideration (that is, the amendment to section 2 of the original act), made by the act of March 11, 1909, is simple, and, if the words therein used are to be understood in their ordinary meaning, the purpose and intent of the Legislature in making the amendment is clear. It is provided:

"There is hereby levied an assessment against the capital stock of each and every bank and trust company organized or existing under the laws of this state for the purpose of creating a depositors' guaranty fund equal to five (5) per centum of its average daily deposits during its continuance in business as a banking corporation."

If the Legislature had intended to levy an assessment against state banks and trust companies equal to 5 per centum of their average daily deposits for the purpose of creating a depositors' guaranty fund, and to provide that such assessment should only be upon the average daily deposits during the existence of the bank or trust company as a banking corporation, and intended such assessment to be a present and existing liability, language more clearly expressing such intention could not have been employed. The fact that it was provided that only 1 per cent. of this obligation should be paid during the first year and extended the time of payment of the remaining 4 per cent. over a period of 16 years does not lessen the purpose and intent to make the obligation of the entire amount a fixed and present liability. It was necessary to make it a present obligation against the banks in order to accomplish the purpose and object of the Legislature in creating the depositors' guaranty fund, namely, to establish confidence in state banks and to offer an absolute guaranty to the

depositors against loss.   The purpose of the Legislature
was evident to make this burden on the banks as light as
possible, and for that reason the time of paying the assess-
ment was extended over a number of years, but it was
necessary to fix liability for all of the assessments at once,
in order to create and establish a guaranty fund in fact as
well as in name.

The ingenuity and learning displayed by the eminent
counsel for the defendant in error, both in oral argument
and in briefs, in their effort to interpret into this statute
some other and different meaning than that apparent from
the words used therein, commands my admiration, but
does not convince my judgment.   As was said by Mr.
Justice Holmes, in the Noble State Bank Case, such effort
seems to be to press the broad words of the statute to a
"drily logical extreme."   It does not seem to me that there
is any necessity to invoke rules of statutory construction
in this instance, since the language employed by the Legis-
lature in this enactment, taken in connection with the
history of the legislation, clearly shows the purpose and
intent of the amendment.

The power of the Legislature to enact this statute has
been definitely determined both by the decision of this
court and that of the Supreme Court of the United States,
in *Noble State Bank v. Haskell,* 22 Okla. 48, 97 Pac. 590,
affirmed in 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112,
32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487.   Mr.
Justice Holmes, in rendering the opinion of the Supreme
Court of the United States in the Noble State Bank Case,
*supra,* and justifying the legislation under the police
power of the state, said:

"It may be said in a general way that the police power
extends to all the great public needs.   *Camfield v. United
States,* 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260.   It
may be put forth in aid of what is sanctioned by usage, or
held by the prevailing morality or strong and preponder-
ant opinion to be greatly and immediately necessary to the
public welfare.   Among matters of that sort probably few

would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits; to such an extent do checks replace currency in daily business. If, then, the Legislature of the state thinks that public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a private benefit as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency of checks secure, and by the same stroke to make safe the almost compulsory resort of depositors to banks as the only available means for keeping money on hand. The priority of claim given to depositors is incidental to the same object and is justified in the same way. The power to restrict liberty by fixing a minimum of capital required of those who would engage in banking is not denied. The power to restrict investments to securities regarded as relatively safe seems equally plain. It has been held, we do not doubt rightly, that inspections may be required and the cost thrown on the bank. See *Charlotte, C. & A. R. Co. v. Gibbes,* 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051. The power to compel, beforehand, co-operation, and thus, it is believed, to make a failure unlikely and a general panic almost impossible, must be recognized, if government is to do its proper work, unless we can say that the means have no reasonable relation to the end. *Gundling v. Chicago,* 177 U. S. 183, 188, 20 Sup. Ct. 633, 44 L. Ed. 725, 728. So far is that from being the case that the device is a familiar one. It was adopted by some states the better part of a century ago, and seems never to have been questioned until now. *Danby Bank v. State Treasurer,* 39 Vt. 92; *People v. Walker,* 17 N. Y. 502. Recent cases going not less far are *Lemieux v. Young,* 211 U. S. 489, 29 Sup. Ct. 174, 53 L. Ed. 295, 300; *Kidd, D. & B. Co. v. Mussleman Grocer Co.,* 217 U. S. 461, 30 Sup. Ct. 606. 54 L. Ed. 839. * * * We cannot say that the public interests to which we have adverted, and others, are not sufficient to warrant the state in taking the whole business of banking under its control. On the contrary, we are of the opinion that it may go on from regulations

to prohibition, except upon such conditions as it may prescribe. In short, when the Oklahoma Legislature declares by implication that free banking is a public danger, and that incorporation, inspection, and the above described co-operation are necessary safeguards, this court certainly cannot say that it is wrong."

Other objections made by the defendant in error are so fully answered by Mr. Justice Bleakmore in the opinion heretofore filed in this cause that I feel justified in adopting the same as a part of this opinion, as follows:

"It is the contention of defendant that the section above quoted does not impose a fixed present liability upon a state bank of 5 per cent. of its average daily deposits, but that it provides annual liabilities, equal to 1 per cent. of such deposits payable the first year and one-fifth of 1 per cent. on such deposits payable each year thereafter, only so long as said bank receives deposits and transacts business as a state bank. But from the language of the act, 'there is hereby levied against the capital stock of each bank and trust company organized under the laws of this state, for the purpose of creating a depositors' guaranty fund, an assessment equal to 5 per cent. of its average daily deposits during its continuance in business as a banking corporation,' it is clear that the purpose of the Legislature was then and thereby to create a fund for the immediate and continuous protection of depositors in state banks, in a fixed, indivisible, and invariable sum, to wit, 5 per cent. of the amount of their average daily deposits, and that an assessment therefor was then levied against each state bank, which every such bank, as a condition precedent to receiving deposits, agreed and was bound to pay, as designated in the act. That this was the intention of the lawmakers is, if possible, more strongly impresesd upon us by the next succeeding section, which provides for emergency assessments, should the same become necessary, to prevent the impairment of such fund.

"The fact that the Legislature, as an act of grace, permitted the payment of the assessment so levied to be deferred and made in installments, in no way affects the liability of the bank for the entire amount thereof. There is no inequality in the law. It provides a uniform charge against each and every state bank for the privilege of re-

ceiving deposits.   When a bank engages in business and accepts deposits, it assumes this liability, and agrees to pay to the state a sum equal to 5 per cent. of its average daily deposits during its continuance in business, and no more, for such franchise.   It may exercise the rights conferred by the statute for the full term of its charter without further charge (save emergency assessments), or it may retire from business at any time; but, in any event, this liability to the state for the benefit of the guaranty fund has been incurred and must be discharged.   The guaranteeing of deposits occasions, not only assurance to the depositor, but relief to the bank from any apprehension of any unnecessary run upon and withdrawals from the bank.   Whilst such assessment for the guaranty fund goes to the protection of every other bank, as well as its own, yet every bank receives a reciprocal benefit for its *pro rata* assessment paid into such fund, and thereby there is an equal reciprocal benefit to every bank in the state. *Noble State Bank v. Haskell,* 22 Okla. 48, 97 Pac. 590.

"If a state bank liquidates or converts to a national bank, it is in no position to complain of injustice or hardship in being compelled to pay for the benefits not received by it but enjoyed by other banks, for it has voluntarily renounced the privileges afforded by the state law.   This section, *supra,* has no application to the banks which do not accept deposits.   It is the action of the bank itself in receiving deposits that causes the law to attach or creates any liability under it.

"It is urged that to enforce the payment of such assessment against a bank that has converted itself into a national bank under the federal banking act is to place impediments in the way of the exercise of the rights of such bank to nationalize; that it is, in effect, penalizing such bank for taking advantage of the rights offered it under the national banking act, and impairs its efficiency as a federal agency.   The Oklahoma statute does not attempt to legislate with regard to national banks.   While the federal laws regulating national banks provide a complete system for the government of such institutions and are supreme in their sphere, and no state may enact laws inimical to such banks, thus frustrating the purpose of Congress, or in any wise impairing their efficiency as federal agencies, yet the national banking act offers no

city of refuge to which a state bank, by taking advantage of its provisions and converting, may in safety flee with its just debts unpaid.

"A state bank may, under the provisions of the federal act, convert into a national bank, secure the benefits of the national law, and put itself beyond the control of the state, but it cannot, by such legal metamorphosis, escape the liabilities it has incurred during its existence as a state institution. The conversion of a state bank into a national bank 'simply resulted in a continuation of the same body with the same officers and stockholders, the same property, assets, and banking business under a changed jurisdiction'; and such bank so converted is bound to meet its obligations to the state incurred under and fixed by section 3, *supra*, in the installments and at the times designated in said section, the same as if it had continued to exist as a corporation under the state law, the terms of the payment being as fixed and certain as the amount to be paid.

"In *Metropolitan National Bank v. Claggett*, 141 U. S. 520, 12 Sup. Ct. 60, 35 L. Ed. 841, it was said: 'The second defense set up in the answer, as we have seen, is that the defendant below became a national bank under the authority of the act of Congress of 1864, * * * and thereby acquired immunity from liability for the bank bills issued by the state bank. The court found that the plaintiff in error (defendant below) did become a national bank doing a banking business under the laws of the United States, but decided that it did not thereby acquire an immunity from liability to pay the bank bills of the Metropolitan Bank of New York, upon the ground that the proceedings set up in the answer did not terminate the existence of the state bank, but simply effected a continuation of the same body under a changed jurisdiction. * * * The question we are to consider here is: Did the court err in holding that the plaintiff in error was not exonerated from liability either by its becoming a national bank or by the proceedings for the redemption and retirement of its circulating bills issued whilst a state bank? * * * The court decided * * * that the change or conversion of the Metropolitan Bank into the Metropolitan National Bank did not "close its business of banking" nor

destroy its identity or its corporate existence, but simply resulted in a continuation of the same body with the same officers and stockholders, the same property, assets, and banking business under a changed jurisdiction; that it remained one and the same bank, and went on doing business uninterruptedly; and that therefore the statutory proceedings relied upon in the answer could not operate as a bar to the liability of either bank to pay the bills delivered by the Metropolitan Bank in 1861 to plaintiff's intestate. This decision is so manifestly correct that it needs no argument.' *Michigan Ins. Bank v. Eldred,* 143 U. S. 293, 12 Sup. Ct. 450, 36 L. Ed. 162; *Coffey v. National Bank of Missouri,* 46 Mo. 140, 2 Am. Rep. 488; *Kelsey v. National Bank of Crawford,* 69 Pa. 426.

"Again, it is contended that this action cannot be maintained for the reason that the Legislature, by an act approved March 6, 1913, repealed the 5 per cent. assessment and substituted therefor a 2 per cent. assessment, and provided that, when a state bank retires, it is discharged of all future liability. Section 6, c. 22, Sess. Laws 1913, which it is urged repeals section 299, Rev. Laws 1910, providing: 'There is hereby levied against the capital stock of each and every bank organized and existing under the laws of this state an annual assessment equal to one-fifth of one per cent., and no more, of its average daily deposits during its continuance as a banking corporation for the purpose of creating a depositors' guaranty fund'—has no application to a bank which had then ceased to exist under the laws of the state, such as the defendant in error bank. It is unnecessary to pass upon the effect of such legislation, for the reason that it in no way affects the rights of the defendant. There is nothing in the terms of section 3, *supra*, that was intended to or did accelerate the deferred payments, as provided for therein, upon a state bank converting into a national bank; and it cannot be said, as a matter of law, that the effect of such conversion was to mature the installments of the assessment thereby levied, which the statute specifically provided should be payable during each succeeding year until the total amount should be fully paid."

We conclude from the foregoing authorities that the enactment of the bank guaranty law and the amendments

thereto was a proper exercise of legislative power by the Legislature of the state of Oklahoma, and that, by the amendment of section 2 of the original act (*i. e.*, by the act of March 11, 1909), there was levied against each bank and trust company, organized and doing business as a state banking corporation, an assessment equal to 5 per centum of its average daily deposits during the time of its existence as such state corporation, and that this assessment was made a present, existing obligation against each bank and trust company from the date of its organization under the law, and that the surrender of its charter and the organization of any such bank as a national bank did not accelerate the maturity of the payment of the assessment as prescribed in the amendment under consideration, and that the judgment of the trial court, having been rendered for the full amount due the "depositors' guaranty fund" by the defendant in error at the time of the commencement of the action, should, therefore, be affirmed.

The former opinion filed herein is withdrawn, and this opinion substituted therefor, and a rehearing is denied.

TURNER and BROWN, JJ., concur. KANE, C. J., and SHARP, J., dissent.