## CITIZENS' NAT. BANK OF BROKEN ARROW v. STATE ex rel. FREELING, Atty. Gen.

No. 9710.—Opinion Filed June 17, 1919.

Rehearing Denied Oct. 7, 1919.

(Syllabus by the Court.)

1. **Banks and Banking—Depositors' Guaranty Fund——Assessments of State Banks —Liability.**

Section 3, chapter 31, Session Laws 1910-11, providing for a depositors' guaranty fund, for the payment of depositors of failed state banks, does not impose upon state banks a present indebtedness of 5 per centum upon their average daily deposits during their continuance in business as state banks, but does provide for annual payments; the bank being liable only for such of these payments as mature or are payable while it is doing business as a state bank.

2. **Same—Conversion of State into National Bank—Effect.**

The conversion of a state into a national bank does not mature, or make payable, these payments.

3. **Same—State Bank Continuing After Passage of Law—Effect.**

The fact that a state bank continued to do business as a state bank after this law went into effect did not impose this 5 per centum as a liability on the bank, nor did the bank thereby assume or agree to pay it.

Rainey, J., and Garrett, Special Justice, dissenting.

Error from District Court, Tulsa County; N. E. McNeill, Judge.

Action by the State of Oklahoma, on the relation of S. P. Freeling, Attorney General, against the Citizens' National Bank of Broken Arrow. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with direction to dismiss the action.

Ames, Chambers, Lowe & Richardson, for plaintiff in error.

S. P. Freeling, Atty. Gen., Wm. H. Zwick, Asst. Atty. Gen., and Stuart & Cruce, for defendant in error.

KING, Special Justice. This was an action by the state, on the relation of the Attorney General, against the Citizens' National Bank of Broken Arrow, Okla., to recover a balance of $1,975.42 claimed to be due from it to the bank depositors' guaranty fund, as the successor of the First State Bank of Broken Arrow, Okla., on the theory that the 5 per cent. assessment, levied by the state against all state banks to provide this fund for the security of depositors in state banks, created a

present indebtedness, and, notwithstanding the First State Bank paid all parts of this assessment as they matured, up to the time it was converted into this national bank, still this national bank was liable for the whole of this 5 per cent. assessment. The trial court, in accordance with the previous decision of this court, by a divided court in State ex rel. West, Attorney General, v. Farmers' National Bank of Cushing, 47 Okla. 667, 150 Pac. 212, sustained this claim of the state of a present indebtedness of the full 5 per cent. levy, but limited the recovery in this particular action to the parts of the assessment maturing between the time of this conversion and the filing of the petition; and the bank appeals.

While the amount involved in this particular case is small, it is stated in the briefs and on the argument that more than 100 national banks are in a similar situation, and the amount involved to the fund more than $600,000. The facts are not disputed, and the case turns on the construction of the statute creating this fund, section 3, c. 31, Session Laws 1910-11.

It is contended by the bank that it was liable only for such parts of this assessment as matured while it was doing business as a state bank. It is contended by the state that this statute created a present existing indebtedness of 5 per cent. of the average daily deposits of this and every other bank, during their continuance in business as state banks, and further, by continuing to do business under the law, the bank assumed and agreed to pay the same—a contractual liability. If this is true, then this bank, which paid all these maturing assessments up to the time it nationalized, must continue to pay for some 15 years these remaining assessments, during which time neither it, nor its depositors, will have any benefit from these payments, nor from this fund—a plain act of injustice, and this on the ground of logic. It may be the logic of my Lord Coke. It certainly is not the justice of my Lord Chancellor, and, when logic and justice part company, so much the worse for logic. Not that the judge may decide cases according to his particular ideas of justice, for it must never be forgotten that this is a government of law and not of men. No doubt Nero and Ivan the Terrible administered justice according to their ideas of justice; and the Roman or Russian citizen had a sportsman's chance of guessing how Nero or Ivan would act under particular circumstances. But even that poor privilege would be denied an American citizen, for he cannot know in advance what particular judge will decide his case. Justice, and not logic, is the

object of the law. The Giver of all real law gave us a much better guide to the interpretation of the law than all the logicians, when he said: "By the fruit ye shall know the tree." It must be presumed that the Legislature did not intend by this act an actual injustice. Such a motive should not be lightly attributed to such a body; for the law, rightly enacted and rightly interpreted, follows along the moral, rather than the logical, lines.

It is contended that this act made a levy in praesenti, a present indebtedness, against all the banks operating under the law; and, as this bank did business for more than a year under this law, it is liable for the full 5 per cent. of this assessment. Both the premise and the conclusion of this proposition are unsound. The parent and the child are alike discredited. Let us examine this act. It provides (section 3, c. 31, Session Laws 1910-11):

"There is hereby levied an assessment against the capital stock of each and every bank and trust company organized or existing under the laws of this state, for the purpose of creating a depositors' guaranty fund, equal to five per centum of its average daily deposits during its continuance in business as a banking corporation."

Now does this last clause, "during its continuance in business," refer to the "five per centum of its average daily deposits," or to the "assessment"? If the fund is to be "equal to five per centum of its average daily deposits during its continuance in business as a banking corporation," no man can tell what the amount of this fund will be until every state bank goes out of business or this law is repealed, maybe more than 100 years; and unless the levy is to be unnecessarily excessive, some depositors may have to wait a long time for their money, from a very easy collector. That this clause does not refer to "its average daily deposits during its continuance in business" is made plain by the next sentence:

"Said assessment shall be payable one-fifth during the first year of existence of said bank or trust company, and one-twentieth during each year thereafter until the total amount of said five per cent assessment shall have been fully paid."

This would be impossible, if the average daily deposits of the bank during its continuance in business was the basis for computing the amount of the assessment. There must be some other basis, and it is accordingly given in the third sentence, as follows:

"The average daily deposit of each bank during the preceding year prior to the passage and approval of this act shall be taken as the basis for computing the amount of the first payment on the levy hereby made."

Not the average for the existence of the bank. The fourth sentence provides:

"One year after the passage and approval of this act, and annually thereafter, each bank and trust company, doing business under the laws of this state, shall report to the bank commissioner the amount of its average daily deposits for the preceding year, and, if such deposits are in excess of the amount upon which the first or subsequent payment of the levy hereby made is computed, each bank and trust company, having such increased deposits, shall immediately pay into the depositors' guaranty fund a sum sufficient to pay any deficiency on said first or subsequent payment, as shown by such increased deposits, by giving credit to the depositors' guaranty fund and issuing a special certificate of deposit, payable to the bank commissioner, bearing four per centum interest per annum."

Evidently using the first year's average as the basis for computing the amount of each subsequent payment until there is an increase, and then using that. By the fifth sentence it is provided:

"After the five per centum assessment, hereby levied, shall have been fully paid, no additional assessment shall be levied or collected against the capital stock of any bank or trust company, except emergency assessments hereinafter provided for, to pay the depositors of failed banks, and except assessments that may be necessary by reason of increased deposits to maintain such funds at five per centum of the aggregate of all deposits in such banks and trust companies, doing business under the laws of this state."

Evidently this statute contemplates the raising of this fund in 17 annual payments, and when the seventeenth is paid in the 5 per cent. fund is paid in, or, to use the language of the statute, "the five per centum assessment hereby levied shall have been fully paid." So that it is clear that the basis of computation is the preceding year's deposits, and not the average daily deposits during the continuance of the bank in business. It is evident, therefore, that these words, "during its continuance in business as a banking corporation," have no reference to the preceding clause, "equal to five per centum of its average daily deposits." The only other part of this sentence to which they could possibly refer is the assessment, and by reason of the succeeding sentences of the section a necessary reference. So that the meaning of the sentence is, and its words might properly be rearranged so as to read:

"There is hereby levied against the capital stock of each and every bank and trust company, organized or existing under the laws of this state, an assessment, during its continu-

ance in business as a banking corporation, for the purpose of creating a depositors' guaranty fund, equal to five per centum of its average daily deposits."

Now, while this first sentence does not divide this 5 per centum into annual assessments, the succeeding sentences plainly do; and the meaning of this statute is just as though it were written into this first sentence that this 5 per centum is divided into 17 different annual assessments, maturing and payable annually, by each and every bank, "during its continuance in business." That is, if any of these annual assessments was not payable "during its (the bank's) continuance in business," it was not and never could become a liability of the bank. Besides, when the bank went out of business there was no means of ascertaining the amount of these future assessments; and it is impossible to pay that which cannot be ascertained, and it is not fair to attribute this to the Legislature as an oversight. Unless this is the meaning of this statute, the words "during its continuance in business" have no meaning. The object of the law was to secure the payment of current deposits, not deposits existing at the time of the completed payment of this 5 per centum, or when the bank had gone out of business, but during all the time these assessments were maturing, as well as after.

When the bank went out of business as a state bank, and its liabilities settled, there were no deposits to be guaranteed, so far as it was concerned. and there was no consideration for any future payments. There was nothing for the law to act upon; and when the reason of the law ceases, then the law itself ceases. The payments of these assessments are conditioned on the bank going on with, not stopping, business. Evidently the Legislature so intended it, for by the act of 1913 (Session Laws 1913, p. 31) it is provided:

"Whenever any state bank shall liquidate, or cease to operate under the banking laws of this state, it shall be liable for its pro rata share of any existing indebtedness against the said depositors' guaranty fund or any unpaid assessments."

Thus furnishing the rule of thumb for the interpretation of the law, and not the law itself. And so the Supreme Court of the United States understood this law, for in the case of Noble State Bank v. Haskell, 219 U. S. 575, 31 Sup. Ct. 299, 55 L. Ed. 341, in sustaining the constitutionality of this law, that court says:

"For in this case there is no out and out unconditional taking at all. The payment can be avoided by going out of the banking business, and is required only as a condition for keeping on, from corporations created by the state."

But it is contended that the bank, by continuing to do business under the act, assumed and agreed to pay this full 5 per cent. —a contractual liability. It will be remembered that the constitutionality of this law was sustained by the Supreme Court of the United States, in the Noble State Bank Case, supra, as a valid exercise of the police power of the state. In the opinion of the writer this particular law might also be sustained as a valid exercise of the taxing power; the purpose being a public purpose—that is, taxation by assessment, as in drainage or paving districts. It has many of the features of a tax law, and in the opinion of the writer such it is, and should be so construed.

But whether we regard it as the exercise of the police power, or the taxing power, or of both, clearly this cannot be a contractual liability. Nor can it be enforced on the ground of estoppel. The estoppel might, in a particular instance, render a statute enforceable; but it does not, and cannot, substitute a contract for the statute. It is true that we have what are known as implied contracts. But this is where the party contracts by his acts. A man can contract by his acts, as well as by his tongue, or his pen; for they are but different means of expressing his assent, and acts speak louder and more sincerely than either the tongue or the pen. But surely the man in the street—this man well beloved of the law; in the last analysis. the only really great lawyer—would not feel that he was agreeing to pay this involuntary exaction merely because he did not quit business, any more than the colonies felt they were bound to pay the taxes imposed by the British Parliament merely because they continued to exist as colonies.

Evidently the Legislature did not regard this assessment as contractual in its nature. The act of 1907-08 (Laws 1907-08, c. 6, art. 2) provided for a fund of 1 per cent. The 1909 act (Laws 1909, c; 5, art. 2) raised this to 5 per cent. The act of 1913 substituted a fund of 2 per cent. The act of May, 1908, amended the law, so as to make it applicable to trust companies; and the act of 1911 changed the law, so as to exclude trust companies. It may repeal the law, and thus relieve all the banks from the payment of these future assessments. This law did not require or permit any act on the part of the bank for its enforcement. The bank's assent or dissent was absolutely immaterial. Its agreement, express or implied, was equally so. The Leg-

islature was proceeding under a power which required none of these. It was an enforced, involuntary charge, as all taxes and all impositions under the taxing and police power are, in invitum, willing or unwilling, and is to be so construed; and, speaking only with reference to the exercise of these powers, an assessment is not a contract, and, if a contract, it is not an assessment.

This law is therefore to be regarded as the lawfully expressed determination and purpose of the Legislature to impose these assessments as they became payable upon the banks as a condition of going on, and not of stopping business. If a bank is doing business when one of these assessments becomes payable, it is liable; if not, it is not. The consideration which this law gives for these assessments is the securing of current deposits, and thereby securing the banks; and when the consideration for the assessment fails, evidently the assessment itself fails.

The writer is aware that there are many decisions, state and federal, imposing taxes under the form of contract; taxation by presumption, taxation by inference—logic, if you please; each presumption, and each inference, more hazy and nebulous than the other, until the most powerful legal telescopes and microscopes fail to discover any foundation for the tax. This is to impose taxes without any known rule of law to support them. It is to ignore and set at naught the beneficent and restrictive provisions of the Constitution, and the fundamental law, like equality, uniformity, classification, popular vote, notice, opportunity to be heard, public purpose, etc. The American and English people, through hard and harsh experience, have hedged about the levy of taxes and other exactions with many beneficent provisions and restrictions; and to substitute contracts or other devices for the tax is to ignore these provisions, and leave the exaction to the mere whim of the official, or the exercises of the logician in his favorite sport.

Besides, the courts have neither the means nor the machinery to impose, collect, or apply taxes. Their forms of procedure, including the judgment, which latter so largely determines their jurisdiction, were never intended, and are wholly inadequate and unsuited, to impose, collect, or apply taxes; and the writer sincerely hopes that the Supreme Court of the United States will early have, occasion to review these decisions, fundamentally, and he firmly believes, when it does so, it will judicially condemn to death this false doctrine, as it was denounced in the Magna Charta and the declaration of American Independence, and as it was in fact shot to death at Bunker Hill and at Yorktown; for, no matter how often one head of this hydra-headed monster is cut off, another springs up in its place. The power to tax has been wisely withheld from the courts by the people. The case at bar is a good example of this. If this court can imply a contract to pay this assessment, neither this bank, nor its depositors, will probably receive any benefit from them. Yet the state bank that remains in business for more than 20 years will only have to pay 3 per cent., instead of 5 per cent., and it, and its depositors, get the benefit of this fund during all those years.

It is also true that there are a number of decisions which enforce the payment of what are in reality taxes under the form of contract. But on investigation it will be generally found that the basis of these decisions is an express contract with the taxpayer, by express legislative authority, in lieu of the ordinary property tax, like the payment of a certain per cent. of its gross revenue by a railroad company, in consideration of its release from the ordinary property tax, or the payment of a large license or charter fee for a similar consideration. But in these instances it is the Legislature, and not the court, which imposes the tax; sometimes doing indirectly that which it cannot do directly, and generally owing to the unfortunate wording of some constitutional provision, and often aided by a too literal construction. For example, to take one of many, the Eastern states omit in their Constitutions any important restrictions upon the taxing powers of the Legislature, thus permitting the Legislature to adjust the taxing system of the state to the ever-changing conditions of society. Unfortunately the constitutional convention of Ohio, in its early Constitution, provided for the taxation of property by uniform rule, without any provision for the classification of property for the purpose of taxation. This was copied by the other states in their Constitutions. from the Alleghenies to the Pacific—at the time a perfectly proper provision, for all property was tangible. But as conditions changed it was soon found that the poor man working in the street with his single team was paying more taxes than the rich corporation with its intangible property; and too often this was assisted by a too literal construction, for classification is uniformity, and uniformity is classification, and, while there are no new principles in constitution making, the ever-changing conditions of an enterprising and progressive people make amendment and restatement in constitutions a never-ending and ever-pressing necessity. As the ocean keeps itself pure by constant agitation, so the state

must keep itself efficient by constant progress in law-making; and as to this particular question this has been largely done by amendment in some of the states, and by the original in others, so that generally there is no necessity to resort to these substitutes and subterfuges in the imposition of taxes. That which is a contract should stand on its own bottom as a contract, and that which is a tax as a tax, in order that the citizen and the state may have the protection of the beneficent provisions of the Constitution and the fundamental law; and the courts should, as they generally do, lend a sympathetic ear to discover the purpose of the law and the intent of the Legislature, in order that they may recognize the one and give effect to the other.

We have no professional lawmakers. It is not right to construe these laws, fundamental or statutory, as though they sprung full-fledged and full-armed from the head of some professional constitution-making Jove. We have no professional class of constitution makers or legislators; and we must not forget that the constitution maker and the legislator have troubles and difficulties of their own. The paucity of language, the absence of time-tried, tested, and applied legislation, the ever-changing conditions of an enterprising and progressive people, the limitations of human foresight, and the difficulty, the impossibility, of covering a world of single instances, make this hard and fast rule impossible. As intimated above, the writer is of the opinion that this statute is of the nature and should be construed as a tax measure. He cannot see any constitutional restriction, preventing the Legislature from forming the whole state into one banking district and applying the principle of taxation by assessment, to raising the necessary fund to secure the payment of these deposits, as is done in the formation of drainage districts and paving districts. The fact that these involve real estate is only because real estate is most commonly benefited. But there can be no difference in principle between real estate and personal property; and manifestly the capital stock of these banks is benefited by this fund. The fact that a paving district or a drainage district is but a small part of the state does not militate against this, as it happens that only those parts are sufficiently benefited to warrant the exercise of the power. No doubt the entire state could be formed into one road district, or one school district, and the state itself collect the revenue, and regulate and maintain the highways and schools. This is a mere matter of apportionment.

Nor, if we consider that this statute is sustained, and sustained only, by the police power, does this prevent the Legislature from introducing into it certain features of the more beneficent taxing or other powers. The police power is not a mere arbitrary, cruel power; it is as kindly as the people from whom it springs, and yields in proper cases to the more beneficial taxing power, as well as other powers, as the good policeman yields to the sympathetic, kindly hand of the parent to stay the wayward youth. The authority to form drainage districts and paving districts, as we know them, is entirely statutory, though the germ may be found in the old charters and statutes. For instance we read in the Magna Charta:

"23—Neither a town nor any tenant shall be distrained to make bridges or banks, unless that anciently and of right they are bound to do."

Truly out of the old fields "cometh the new corn." A reading of the old statutes and decisions would indicate that originally the formation of drainage districts was done principally under the police power—the right of the state in the interest of the public health and sanitation, to drain swamps and overflowed lands; and this is still indicated in our statute, and the statutes of other states. Yet this did not prevent the Legislature from introducing into it taxation by assessment, and making it a real benefit to the land and the landowner; and this although the police power may proceed without being limited by benefit to the person or property affected. The hand of the Legislature should be left free to give as much return to the banks for this fund as it may; to make it in reality the property of the banks, subject to the management and application by the state as provided. Throw around it the constitutional guaranties of equality, uniformity, classification, public purpose, etc., and impose the tax by that authority which alone can impose taxes, the people's representatives. By basing the fund on the taxing power, you give it the very highest security; that power which makes the bonds of the United States and the states the very best security. And by giving this security it removes the fear of loss, the fear of panic, and permits the very largest use of the bank's fund in the business of the community. It prevents the arbitrary exaction of the official, and the disastrous consequence of hasty and ill-considered action. It gives to those who have to bear the burden an opportunity to be heard, and an assurance of the necessity for, and the proper application of, the fund; and it enlists the hearty co-operation of those whose duty it was, and whose interest it now is, to protect their depositors.

The case of State ex rel. West, Attorney General, v. Farmers' National Bank of Cushing, 47 Okla. 667, 150 Pac. 212, is overruled. The judgment is reversed, and the case remanded, with directions to dismiss the action.

HARRISON and McNEILL, JJ., certifying their disqualification, J. F. KING and A. R. GARRETT were regularly appointed Special Justices.

OWEN, C. J., and PITCHFORD and JOHNSON, JJ., concur.

KANE and SHARP, JJ., concur in the conclusion.

HIGGINS, J., did not participate.

RAINEY, J., (dissenting). I dissent, as I am in thorough accord with the views expressed by this court in State ex rel. West, Attorney General, v. Farmers' National Bank of Cushing, 47 Okla. 667, 150 Pac. 212, which is overruled by the majority opinion.

GARRETT, Special Justice, (dissenting). The contention in this case arises from the construction of section 3, chapter 31, Session Laws 1910-11, particularly that portion of said section which reads as follows:

"There is hereby levied an assessment against the capital stock of each and every bank and trust company organized or existing under the laws of this state, for the purpose of creating a depositors' guaranty fund, equal to five per centum of its average daily deposits during its continuance in business as a banking corporation."

The contention of the state is that the language used by the Legislature created what is termed a levy or existing liability in praesenti. The court in its opinion has placed a different construction upon this sentence of section 3, and in doing so transposes the language in the sentence to read as follows:

"There is hereby levied against the capital stock of each and every bank and trust company organized or existing under the laws of this state, an assessment during its continuance in business as a banking corporation for the purpose of creating a depositors' guaranty fund equal to five per centum of its average daily deposits."

By what rule of statutory construction has this court authority to interpolate into a statute words or a transposition of language in order to support the court's construction? The very fact that the court has found it necessary to transpose the language is sufficient condemnation of its opinion. There is no disposition upon the writer's part to criticize the defendant bank for seeking to escape the judgment in this case if there is no liability, but to undertake to escape through the claim that it is unjust and unfair is to beg

the question. This court has nothing to do with the justness or unjustness of the law, if the law is clear and plain as to what is meant. We could cite numerous instances of what is apparently unfair and unjust in our tax laws. Take, for instance, the mortgage tax law of real estate, which fixes a registration fee of 10 cents upon $100 expressed in the mortgage, where the mortgage runs for five years or more, an exceedingly nominal sum which the mortgagee pays on his investment; while the mortgagor must pay on the full valuation of the real estate given as security in the mortgage on an ad valorem basis. Yet this court would hardly say that the Legislature did not have the authority to pass the law because of its unjustness or apparent unfairness. Again, we have the gross production tax on oil. All other business must pay on an ad valorem basis. Now, if the gross production tax is fair, then why not make it the same basis of taxation for other property. We have in this state a license system, licensing automobiles, which is merely a form of taxation, and the right is fixed according to a mechanical definition of the horse power developed by the engine in the automobile. A "tin lizzie" costing $500, because of the fact that its engine develops a higher rate of horse power than a car that costs $2,500, under this automobile license law must pay as much or a higher rate for the privilege of running upon the highways of this state as the car that cost five times as much, and, yet, were this question before this court, the court no doubt would go into details as to the beneficent effect and purposes of the automobile license fund, which is to build up the highways of the state, and would certainly hold that the Legislature had authority to pass the law and that it was valid. Our tax system is so constructed that injustice must of necessity follow until we have learned some other method that would be fair alike to all.

Let me suggest, further: Is it fair to the poor widow woman to pay the same rate of tax on her one milk cow, on which she makes no profit, other than supplying her orphan children with an allowance of milk and butter, as the man who keeps his hundreds and thousands for profit and gain alone? We could cite so many instances of what to our mind is unjust and unfair in our tax system that the reference would be entirely too lengthy. But why base this opinion in this case upon the proposition that it is unfair to require a liquidating bank to pay its liabilities before it can surrender its certificate and cease to do business under the banking laws of the state? It is its duty to pay its liabilities. The state did not require the de-

fendant bank to discontinue as a state bank. The state does require, as a condition precedent to ceasing to do business as a banking corporation, that it discharge all its liabilities. The defendant, while doing business as a state bank, had the pledged security behind its deposits of a levy of 5 per cent. against the capital stock of every bank doing business under the state banking laws, based upon its average daily deposits. This was worth a great deal to the bank in the way of securing business and in assuring its customers that their deposits were absolutely safe.

It is suggested in the court's opinion that something like $600,000 is involved in the result of this suit. It is true this is quite a large sum, but what has this to do with the question at issue. Briefly stated, the contention of the state is that the first sentence in section 3, chapter 31, Session Laws 1910-11, created a levy is praesenti, as held by this court in the case of State ex rel. West, Attorney General, v. Farmers' National Bank of Cushing, 47 Okla. 667, 150 Pac. 212; while the defendant contends that said sentence does not create a present liability. Special Justice Galbraith, in his opinion in the case, supra, uses this language:

"If the Legislature had intended to levy an assessment against state banks and trust companies equal to 5 per centum of their average daily deposits for the purpose of creating a depositors' guaranty fund, and to provide that such assessment should only be upon the average daily deposits during the existence of the bank or trust company as a banking corporation, and intended such assessment to be a present and existing liability, language more clearly expressing such intention could not have been employed. The fact that it was provided that only 1 per cent. of this obligation should be paid during the first year and extended the time of payment of the remaining 4 per cent. over a period of 16 years does not lessen the purpose and intent to make the obligation of the entire amount a fixed and present liability. It was necessary to make it a present obligation against the banks in order to accomplish the purpose and object of the Legislature in creating the depositors' guaranty fund, namely, to establish confidence in state banks and to offer an absolute guaranty to the depositors against loss. The purpose of the Legislature was evidenced to make this burden on the banks as light as possible, and for that reason the time of paying the assessment was extended over a number of years; but it was necessary to fix liability for all of the assessments at once, in order to create and establish a guaranty fund in fact. as well as in name."

The court, however, has tried to apply the rule of statutory construction, by declaring it would be unjust and unfair to the Legislature to claim that the language used created a levy in praesenti, and that it would be taking from the defendant bank when it was receiving no benefits from the depositors' guaranty fund. The Legislature that passed that law was composed of as intelligent men as the average man; they knew the real import of the language used and the purposes for which this fund was created. The Legislature of 1913 also knew just what the language meant in section 3, chapter 31 Session Laws 1910-11, and proceeded to change the law, so as to accomplish just what the court in this opinion is accomplishing in this act. This change occurs in this language (Session Laws 1913, p. 31):

"Whenever any state bank shall liquidate, or cease to operate under the banking laws of this state, it shall be liable for its pro rata share of any existing indebtedness against the said depositors' guaranty fund or any unpaid assessments."

The learned judge, speaking for the court in his opinion in this case, says that this furnishes the rule of "thumb" for the interpretation of the law, and not the law itself. Now, just what is meant by not being the law itself is difficult to discern—another instance where the language used is plain and an attempt is made to confuse the meaning. This amendment of 1913 clearly shows that the Legislature understood well the clear import of the law of 1911, and provided that a bank should be liable, when it ceased to do business under the state law, only for the pro rata amount of the assessment to be paid at the time of liquidating. The defendant bank having gone out of business prior to 1913, so far as a state bank is concerned, the law of 1913 does not apply to it. The Legislature had the power to make a levy in praesenti. It did it. It had a right to say upon what basis the 5 per centum assessment so levied should be determined. It did that. It had a right to say into how many payments these assessments which it levied should be divided. It did that. The language following the first sentence in said section 3 in no way or manner modifies, explains, or affects the language in the first sentence, and no rule of statutory construction will justify this court in reading into this sentence any other term or terms, in order to transpose the language so as to make it have a different meaning.

The general rule of statutory construction, as laid down by Sutherland on Statutory

Construction, in section 589, vol. 2, is as follows:

"A statute extends no further than it expresses the legislative will; when it is held to embrace a case which is within its spirit, though not within its letter, it is not meant that the courts have authority to extend a statute to cases which it does not by its words provide, or beyond the sense of its language. A statute is a written law, and cannot be construed to have a sense and spirit not deducible from its provisions. It is a general rule that the courts must find the intent of the Legislature in the statute itself. Unless some grounds can be found in the statute for restricting or enlarging the meaning of its general words, they must receive a general construction; courts cannot arbitrarily subtract from or add thereto."

And also in section 520, same authority, at page 963, we find this language:

"The intention of the Legislature is to be collected from the words they employ. When there is no ambiguity in the words, there is no room for construction."

The courts are not in the habit of transposing the clauses and phrases for the purpose of finding the meaning of the Legislature, unless the clause or phrase in the position in which it is placed by the Legislature is meaningless and absurd, or conflicts in some way with the fundamental law. The Supreme Court of the United States, in Board of County Commissioners, v. Rollins, 130 U. S. 670, 9 Sup. Ct. 652, 32 L. Ed. 1060, uses the following language:

"We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the Constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well-settled rule which we must observe. The object of construction, applied to a Constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

"To get at the thought or meaning expressed in a statute, a contract, or a Constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the Legislature have the right to add to it or take from it. * * *

"Words are the common sign that mankind make use of to declare their intention to one another; and when the words of a man express his meaning, plainly, distinctly, and perfectly, we have no occasion to have recourse to any other means of interpretation."

The language of the statute in making the levy of 5 per cent. import an immediate levy, and not a levy in the future. In the case of St. Joseph & Denver City Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, that court, speaking by Mr. Justice Field, said:

"The language of the act here, and of nearly all the congressional acts granting lands, is in terms of a grant in praesenti. The act is a present grant. 'There is hereby granted,' are the words used, and they import an immediate transfer of interest."

Quoting again from the opinion of Judge Galbraith, in the case of Farmers' National Bank of Cushing, supra, the court says:

"There was levied against each bank and trust company, organized and doing business as a state banking corporation, an assessment equal to 5 per centum of its average daily deposits during the time of its existence as such state corporation, and that this assessment was made a present, existing obligation against each bank and trust company from the date of its organization under the law."

For the reasons herein set forth, we are compelled to dissent from the opinion of the court by Justice KING in this case. The decision in the case of the Farmers' National Bank, supra, was rendered practically four years ago, being filed on June 26, 1915. It has become a rule of property in this state. Since the rendition of this opinion this court, by reason of the democracy of our institutions and the hand of death, has changed its personnel, and the personnel of the court in the course of time again will change. It has been the pride and boast of our form of government that our Supreme Court was stable, and a bulwark against the ever-changing innovations that society might suggest in our fundamental laws, the Constitutions of our states and the United States. The citizenship of a state takes pride in the firmness with which the laws of the state are interpreted by its Supreme Court. There should be no vacillating policy in the court's decisions, and we believe that the opinion of the court in this case is not the law of the case, but that the court's opinion in the case of the Farmers' National Bank of Cushing is the law and should not be overruled.