# CAMFIELD *v.* UNITED STATES.

APPEAL FROM THE COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 278. Submitted April 20, 1897. — Decided May 24, 1897.

The act of February 25, 1885, c. 149, 23 Stat. 321, is within the constitutional power of Congress to enact, and is valid.

The Government of the United States has, with respect to its own lands within the limits of a State, the rights of an ordinary proprietor to maintain its possession, and to prosecute trespassers; and may legislate for their protection, though such legislation may involve the exercise of the police power; and may complain of and take steps to prevent acts of individuals, in fencing in its lands, even though done for the purpose of irrigation and pasturing.

THIS was a bill in equity, originally filed by the United States in the Circuit Court for the District of Colorado, to compel the removal and abatement of a fence erected and maintained by the defendants, whereby about 20,000 acres of public lands were enclosed, and appropriated to the exclusive use and benefit of the defendants.

The bill averred, in substance, that the defendants Daniel A. Camfield and William Drury, with intent to encroach and intrude upon the lands of the United States in an illegal manner, and to monopolize the use of the same for their own special benefit, did, on or about the 1st of January, 1893, construct and maintain a fence, which enclosed and included about twenty thousand acres of the public domain; that the effect of such enclosure was to exclude the United States and all other persons, except the defendants, therefrom; and that the lands thus wrongfully enclosed consisted of all of the even-numbered sections in townships numbered 7 and 8 north, of range 63 west, of the sixth principal meridian. The bill further averred that said townships 7 and 8 lie within the limits of the grant made by the Government to the Union Pacific Railroad Company; that the defendants had acquired from said railroad company the right to use all the odd-numbered sections of land which lie within said townships 7 and 8 and outside thereof, immediately adjacent to the even-numbered sections lying within and on the margin of said townships, and that, in building the fence complained of, the defendants had constructed it entirely on odd-numbered sections, either within or without townships 7 and 8, so as to completely enclose all of the government lands aforesaid, but without locating the fence on any part of the public domain so included.

The subjoined diagram of one township will serve to illustrate the manner in which the fence was constructed so as to enclose the even-numbered sections. The fence is indicated by the dotted lines.

| 6  | 5  | 4  | 3  | 2  | 1  |
|----|----|----|----|----|----|
| 7  | 8  | 9  | 10 | 11 | 12 |
| 18 | 17 | 16 | 15 | 14 | 13 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 30 | 29 | 28 | 27 | 26 | 25 |
| 31 | 32 | 33 | 34 | 35 | 36 |

The defendants admitted by their answer that they had constructed a fence so as to enclose all of the even-numbered sections in townships 7 and 8 substantially as set out above in the plaintiff's complaint, save and except that at each section line a swinging gate had been placed to afford access to so much of the public domain as was enclosed by the aforesaid fence. By their answer the defendants sought to justify the erection of the fence in question, upon the ground that they owned all the odd-numbered sections in townships 7 and 8, and that they were engaged in building large reservoirs for the purpose of irrigating the land by them owned, and much other land in that vicinity. They averred that, in carrying out such irrigation scheme, they found it necessary to fence their lands in townships 7 and 8, in the manner above described. They also denied that they had any intention of monopolizing the even-numbered sections enclosed by said

fence. or to exclude the public therefrom; and further averred, in substance, that the work in which they were engaged was of great importance and utility, and would redound to the great advantage of the United States and its citizens.

An exception was filed to the answer upon the ground that it was insufficient to constitute a defence to the bill. This exception was sustained, 59 Fed. Rep. 562, and, as the defendants declined to plead further, a decree was entered in favor of the Government, from which decree the defendants appealed to the Court of Appeals, which affirmed the judgment of the Circuit Court. 32 U. S. App. 42, 123. Whereupon defendants appealed to this court.

*Mr. James W. McCreery, Mr. Charles W. Bates* and *Mr. C. W. Bunn* for appellants.

*Mr. Solicitor General* for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

This case involves the construction and application of the act of Congress of February 25, 1885, c. 149, entitled "An act to prevent unlawful occupancy of the public lands." 23 Stat. 321. The first section of the act reads as follows:

"That all enclosures of any public lands in any State or Territory of the United States, heretofore or to be hereafter made, erected or constructed by any person, party, association or corporation, to any of which land included within the enclosure the person, party, association or corporation making or controlling the enclosure had no claim or color of title made or acquired in good faith, or an asserted right thereto by or under claim, made in good faith with a view to entry thereof at the proper land office under the general laws of the United States at the time any such enclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, erection, construction or control of any such enclosure is hereby forbidden and prohibited; and the assertion of a

right to the exclusive use and occupancy of any part of the public lands of the United States in any State or any of the Territories of the United States, without claim, color of title or asserted right, as above specified as to enclosure, is likewise declared unlawful and hereby prohibited."

By section 2 of said act, it is made the duty of the district attorney of the United States for the proper district, when complaint is made to him by affidavit by any citizen of the United States, that section 1 of the act is being violated, to institute a civil suit in the name of the United States in the proper United States District or Circuit Court against the person or persons in charge of or controlling the unlawful enclosure complained of. By this section jurisdiction is also conferred upon any United States District or Circuit Court, or territorial District Court having jurisdiction over the locality where the land enclosed, or any part thereof, shall be situated, to hear and determine proceedings in equity, by writ of injunction, to restrain violations of the provisions of the act. It is also made the duty of said courts in case any enclosure shall be found to be unlawful, to make the proper order, judgment or decree for the destruction of the same, in a summary way, unless the enclosure shall be removed by the parties complained of within five days after they are ordered to do so.

Defendants are certainly within the letter of this statute. They did enclose public lands of the United States to the amount of 20,000 acres, and there is nothing tending to show that they had any claim or color of title to the same, or any asserted right thereto under a claim made in good faith under the general laws of the United States. The defence is in substance that, if the act be construed so as to apply to fences upon private property, it is unconstitutional.

There is no doubt of the general proposition that a man may do what he will with his own, but this right is subordinate to another, which finds expression in the familiar maxim : *Sic utere tuo ut alienum non lædas.* His right to erect what he pleases upon his own land will not justify him in maintaining a nuisance, or in carrying on a business or trade that is offensive to his neighbors. Ever since *Aldred's case,* 9 Coke, 57, it has been

the settled law, both of this country and of England, that a man has no right to maintain a structure upon his own land, which, by reason of disgusting smells, loud or unusual noises, thick smoke, noxious vapors, the jarring of machinery or the unwarrantable collection of flies, renders the occupancy of adjoining property dangerous, intolerable or even uncomfortable to its tenants. No person maintaining such a nuisance can shelter himself behind the sanctity of private property.

It is true that a man may build a fence upon his own land as high as he pleases, even though it obstructs his neighbor's lights, and the weight of authority is that his motives in so doing cannot be inquired into, even though the fence be built expressly to annoy and spite his neighbor; and, that in this particular, the law takes no account of the selfishness or malevolence of individual proprietors; *Mahan* v. *Brown*, 13 Wend. 261; *Chatfield* v. *Wilson*, 28 Vt. 49; *Frazier* v. *Brown*, 12 Ohio St. 294; *Pickard* v. *Collins*, 23 Barb. 444; *Clinton* v. *Myers*, 46 N. Y. 511; *Phelps* v. *Nowlen*, 72 N. Y. 39; *Walker* v. *Cronin*, 107 Mass. 555, 564, although there are many strong intimations to the contrary.

But the injustice of the prevailing doctrine upon this subject, in its practical operation, became so manifest that, in 1887, the legislature of Massachusetts passed a statute declaring that any fence "unnecessarily exceeding six feet in height, maliciously erected or maintained for the purpose of annoying the owners or occupants of adjoining property," should be deemed a private nuisance, and that any such owner or occupant who was thereby injured in his comfort, or in the quiet enjoyment of his estate, might have an action of tort for the damage. The constitutionality of this statute was attacked in the case of *Rideout* v. *Knox*, 148 Mass. 368, but upon full consideration, the Supreme Judicial Court was of opinion that the statute was within the limits of the police power, and was constitutional; and, although the fence was not directly injurious to the public at large, there was a public interest to restrain this kind of aggressive annoyance of one neighbor by another, and to mark a definite limit, beyond which it was not lawful to go. The court also held the statute to be constitutional with refer-

ence to fences already in existence when the act was passed; that although it involved, to a certain extent, the taking of property without compensation, yet "having regard to the smallness of the injury, the nature of the evil to be avoided, the quasi accidental character of the defendant's right to put up a fence for malevolent purposes, and also to the fact that police regulations may limit the use of property in ways which greatly diminish its value," the court was of opinion that the act was constitutional to the full extent of its provisions. The case is authority for the proposition that the police power is not subject to any definite limitations, but is co-extensive with the necessities of the case and the safeguard of the public interests. Apparently the principal doubt entertained by the court was whether the maintenance of a private fence could be said to be "injurious to the public at large," but it seems to have been of opinion that such a nuisance might give rise to disputes and bickerings prejudicial to the peace and good order of the community.

While the lands in question are all within the State of Colorado, the Government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers. It may deal with such lands precisely as a private individual may deal with his farming property. It may sell or withhold them from sale. It may grant them in aid of railways or other public enterprises. It may open them to preëmption or homestead settlement; but it would be recreant to its duties as trustee for the people of the United States to permit any individual or private corporation to monopolize them for private gain, and thereby practically drive intending settlers from the market. It needs no argument to show that the building of fences upon public lands with intent to enclose them for private use would be a mere trespass, and that such fences might be abated by the officers of the Government or by the ordinary processes of courts of justice. To this extent no legislation was necessary to vindicate the rights of the Government as a landed proprietor.

But the evil of permitting persons, who owned or controlled the alternate sections, to enclose the entire tract, and thus to

exclude or frighten off intending settlers, finally became so great that Congress passed the act of February 25, 1885, forbidding all enclosures of public lands, and authorizing the abatement of the fences. If the act be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary, since the Government as an ordinary proprietor would have the right to prosecute for such a trespass. It is only by treating it as prohibiting all " enclosures " of public lands, by whatever means, that the act becomes of any avail. The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute. So far as the fences were erected near the outside line of the odd-numbered sections, there can be no objection to them; but so far as they were erected immediately outside the even-numbered sections, they are manifestly intended to enclose the Government's lands, though, in fact, erected a few inches inside the defendants' line. Considering the obvious purposes of this structure, and the necessities of preventing the enclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. The general Government doubtless has a power over its own property analogous to the police power of the several States, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case. If it be found to be necessary for the protection of the public, or of intending settlers, to forbid all enclosures of public lands, the Government may do so, though the alternate sections of private lands are thereby rendered less available for pasturage. The inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands. While we do not undertake to say that Congress has the unlimited power to legislate against nuisances within a State, which it would have within a Territory, we do not think the admission of a Territory as a State deprives

it of the power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the police power, so long as such power is directed solely to its own protection. A different rule would place the public domain of the United States completely at the mercy of state legislation.

We are not convinced by the argument of counsel for the railway company, who was permitted to file a brief in this case, that the fact that a fence, built in the manner indicated, will operate incidentally or indirectly to enclose public lands, is a necessary result, which Congress must have foreseen when it made the grants, of the policy of granting odd sections and retaining the even ones as public lands; and that if such a result inures to the damage of the United States it must be ascribed to their improvidence and carelessness in so surveying and laying off the public lands, that the portion sold and granted by the Government cannot be enclosed by the purchasers without embracing also in such enclosure the alternate sections reserved by the United States. Carried to its logical conclusion, the inference is that, because Congress chose to aid in the construction of these railroads by donating to them all the odd-numbered sections within certain limits, it thereby intended incidentally to grant them the use for an indefinite time of all the even-numbered sections. It seems but an ill return for the generosity of the Government in granting these roads half its lands to claim that it thereby incidentally granted them the benefit of the whole.

The Government has the same right to insist upon its proprietorship of the even-numbered sections that an individual has to claim the odd sections, and if such proprietor would have the right to complain of the Government fencing in his lands in the manner indicated and leasing them for pasturage, the Government has the same right to complain of a similar action upon his part. If there be any general impression that in dealing with public lands the rights are altogether those of the individual proprietors, and that such rights as the Government has exist only by their sufferance, the act in question will do much to rectify this misapprehension.

These grants were made in pursuance of the settled policy of the Government to reserve to itself the even-numbered sections for sale at an increased price; and if the defendants in this case chose to assume the risk of purchasing the odd-numbered sections of the railroad company for pasturage purposes, without also purchasing or obtaining the consent of the Government to use the even-numbered sections, and thereby failed to derive a benefit from the odd-numbered ones, they must call upon their own indiscretion to answer for their mistake. The law and the practice of the Government were perfectly well settled, and if it had chosen in the past to permit by tacit acquiescence the pasturage of its public lands, it was a policy which it might change at any moment, and which became the subject of such abuses that Congress finally felt itself compelled to pass the act of February 25, 1885, and thereby put an end to them. It was not intended, however, to prohibit altogether the pasturage of public lands, or to reverse the former practice of the Government in that particular. Indeed, we know of no reason why the policy, so long tolerated, of permitting the public lands to be pastured may not be still pursued, provided herdsmen be employed, or other means adopted by which the fencing in and the exclusive appropriation of such land shall be avoided. The defendants were bound to know that the sections they purchased of the railway company could only be used by them in subordination to the right of the Government to dispose of the alternate sections as it seemed best, regardless of any inconvenience or loss to them, and were bound to avoid obstructing or embarrassing it in such disposition. If practices of this kind were tolerated, it would be but a step further to claim that the defendants, by long acquiescence of the Government in their appropriation of public lands, had acquired a title to them as against every one except the Government, and perhaps even against the Government itself.

It is no answer to say that, if such odd-numbered sections were separately fenced in, which the owner would doubtless have the right to do, the result would be the same as in this case, to practically exclude the Government from the even-

numbered sections, since this was a contingency which the Government was bound to contemplate in granting away the odd-numbered sections. So long as the individual proprietor confines his enclosure to his own land, the Government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor; but when, under the guise of enclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to enclose the lands of the Government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large. It may be added, however, that this is scarcely a practical question, since a separate enclosure of each section would only become desirable when the country had been settled, and roads had been built which would give access to each section.

It is equally immaterial that the defendants have undertaken to build large reservoirs for water to be supplied for the irrigation of its lands, or that they have proceeded in accordance with the act of Congress in acquiring the necessary sites to be used in the construction of such reservoirs, or that they have expended large sums of money in providing for this improvement. If they have enclosed the public lands in violation of the statute it is no answer to say that they have enclosed them for irrigating as well as for pasturage purposes. The violation of the statute is none the less manifest from the fact that the defendants had an ulterior purpose, or a purpose other than that of pasturage.

We are of opinion that, in passing the act in question, Congress exercised its constitutional right of protecting the public lands from nuisances erected upon adjoining property; that the act is valid, and that the judgment of the Circuit Court of Appeals must be

*Affirmed.*