Wanamaker, J.
It is claimed that the foregoing statute, known as the “Loan Law,” violates the following provisions of the Constitution of Ohio:
Section 1, Article I. “All men * * * have certain inalienable rights, among which are those *31 of enjoying and defending life and liberty, acquiring, possessing, and protecting property.”
Section 16, Article I. “All courts shall be open and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law.”
It is further claimed that this act violates the provisions of Section 1 of the 14th Amendment to the Federal Constitution, which reads in part:
“No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
Plaintiff in error in his brief gives the following bill of particulars as a basis for the claim of unconstitutionality:
(a) “It gives authority to the superintendent of banks to revoke a license if the licensee violates ‘any of the provisions of this act.’ ”
(b) “The superintendent of banks is made the sole and final judge as to whether or not any violation has taken place. There is no provision for an appeal to the courts or otherwise.”
(c) “There is nothing to prevent the bank superintendent from holding an unfair and ex parte hearing, and in fact, he would not have to hold any hearing at all, but could arbitrarily revoke the license.”
(d) That the exemptions and classifications provided for in such statute are arbitrary and un *32 reasonable, and therefore deny due process of law and the equal protection of the laws.
The chief case relied upon by plaintiff in error to sustain his contentions is Geiger-Jones Co. v. Turner, Atty. Genl., as found in a lengthy opinion of the United States district court, reported in the Ohio Law Reporter under date of April 17, 1916. *
It must be conceded that if that judgment and opinion correctly interpreted the various constitutional provisions involved, and correctly applied them to the statute in question, that judgment and the reasons therefor would apply in the case at bar and demand a reversal of the judgments below; for, in the main, the alleged grievances in the so-called “Blue Sky Law” are substantially the same as the alleged grievances in the “Loan Law.”
Since the submission of this case to this court, and prior to the preparation of this opinion, the United States supreme court has reviewed the decision in the Geiger-Jones case and, with but one judge dissenting, has reversed said judgment. † The reversal is clear and comprehensive on practically all the various grounds set forth in the opinion of the United States district court.
The opinion of the supreme court of the United States is very illuminating upon many of the questions involved in this case.
If the loan-act statute be a constitutional exercise of governmental power, it is conceded that it is so *33 by virtue of what is known as the police power of the state.
Definitions of police power, giving with precision its latitude and longitude with exactness, have not been attempted by any courts. It is wise that it is so, because this, like many of the subject-matters of the law, is constantly in the process of evolution and development, and must be adapted to the social, industrial and commercial conditions of the times.
The police power in effect sums up the whole power of government. All other powers are only incidental and ancillary to the execution of the police power. It is that full, final power that is involved in the administration of law as a means to the administration of practical justice.
Mr. Justice Day in a well-considered opinion has discussed the police power at some length. His views are helpful in this case.
In Sligh v. Kirkwood, 237 U. S., 52, at page 58, he discusses the nature and scope of this power in the following language:
“The limitations upon the police power are hard to define, and its far-reaching scope has been recognized in many decisions of this court. At an early day it was held to embrace every law or statute which concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the state, whether in their public or private relations, whether it related to the rights of persons or property of the public or any individual within *34 the state. New York v. Miln, 11 Pet. 102, 139. The police power, in its broadest sense, includes all legislation and almost every function of civil government. Barbier v. Connolly, 113 U. S. 27. It is not subject to definite limitations, but is coextensive with the necessities' of the case and the safeguards of public interest. Camfield v. United States, 167 U. S. 518, 524. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health. Chicago &c. Railway v. Drainage Commissioners, 200 U. S. 561, 592. In one of the latest utterances of this court upon the subject, it was said: ‘Whether it is a valid exercise of the police power is a question in the case, and that power we have defined, as far as it is capable of being defined by general words, a number of times. It is not susceptible of circumstantial precision. It extends, we have said, not only to regulations which promote the public health, morals, and safety, but to those which promote the public convenience or the general' prosperity. * * * And further, “It is the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government.” ’ Eubank v. Richmond, 226 U. S. 137, 142.”
The title of the original loan act is as follows:
“To regulate and license the loaning of money upon chattels or personal property of any kind and of purchasing or making loans upon salaries or wage earnings.” (102 O. L., 469.)
*35 In the main, so far as it applies to the case before us, it is an act to prevent usury.
. The right to regulate the rate of interest by law is as old as government itself.
“The taking of interest for the loan of money, or at least taking excessive interest, has been regarded with abhorrence from the earliest times. We are told that such usury was prohibited by the early laws of the Chinese and the Hindus, and by the Koran.” 39 Cyc., 889.
Moses announces it as follows:
“If thou lend money to any of my people that is poor by thee, thou shalt not be to him as an usurer, neither shalt thou lay upon him usury.” Exodus XXII, 25.
Originally the word “usury” applied to all rates of interest. Later it was applied only to illegal or excessive rates of interest.
' It is significant that Abraham Lincoln in 1832, when he was but twenty-three years of age, in a campaign for the general assembly of Illinois, declared in an open circular to the people of his county that usury was then an obnoxioüs practice in the state of Illinois and that he stood for a law against it.'
Legislation against usury has been recognized by all the leading nations of the world from time almost immemorial. Excessive or usurious rates of interest assessed or charged against the poor and needy, against those whose small incomes are too often wiped away by illness, enforced idleness or financial reverses, have been vigilantly denounced by the laws of all lands.
*36 It would seem now too late to challenge the constitutionality of shch legislation upon the ground that it is a denial of the right of property or liberty of contract.
The right of property, or liberty of contract with reference to property, is by our own constitution made “subservient to the public welfare.” Where, therefore, a statute seeks to accomplish such purpose as prevention of usury, such statute is clearly within the police power of the state of Ohio under the provisions of both the state and federal constitutions, unless some part of the machinery for its administration may violate some provision of state or federal constitution.
It is, however, suggested, from the title of the act, that the statute and the various sections thereof do not constitute a regulation of interest rates, but really undertake to regulate business, indeed to prohibit the same, and as such are a denial of the right of property — the taking of property without due process of law.
While the right of a state to regulate business, trade or occupation is of much later recognition and development than the right to regulate the rate of interest, it nevertheless is equally well settled to-day, that, in the interest of the public welfare, business, trades and occupations may be so regulated as to prevent extortion, fraud, restraint, monopolistic control of products or prices, and so on.
Whether or not the business of chattel loans is fairly within the police power of the state is no longer an open question in Ohio. This court in *37 Sanning v. City of Cincinnati, 81 Ohio St., 142, in the first paragraph of the syllabus in that case, has stated the generally accepted doctrine:
“The state may, in the exercise of the police power, license and regulate chattel mortgage and salary loan brokers; and it may delegate authority to do so to municipal corporations.”
So it matters not whether the purpose of the statute be the regulation of a business or the denouncement of usury; in either event the paramount purpose of the statute is within the legal exercise of the police power of the state.
We come now to consider the second question as to whether or not the plans and provisions of the statute for the promotion of such purposes are a legal exercise of such police power.
The legal machinery provided by the statute for the enforcement of its provisions obviously must be operated by some officer or board. The statute designates the superintendent of banks as such officer. He grants the license provided for by the act, and agreeable to the act may revoke a license. He is merely the executive of the state for the enforcement of the statute, and the presumption surely is that he would exercise his discretion fairly and justly and in accordance with the purpose, terms and spirit of the act.
No serious claim is made that the provisions of the statute relating to the granting of licenses are in any wise unconstitutional, particularly because of any broad discretion or arbitrary power lodged in such superintendent of banks touching the issuing of licenses. The statute in this respect prac *38 tically deprives him of the exercise of any discretion and recognizes him only as a ministerial officer.
Section 6346-2 provides for the application for such license, the payment of the fee of $100 therefor, and the term of such license. No complaint is made that the license fee is unreasonable, or that any of the provisions expressed in the statute for the issuing of the license are arbitrary or unreasonable.
But it is claimed that the classifications and exemptions made by the statute, as to those required and not required to obtain licenses, render the statute null and void; because, it is claimed, such do not give the petitioner the “equal protection of the laws.”
Naturally questions of this character are more frequently before the United States supreme court, under the due-process and equal-protection-of-the-laws clauses of the 14th Amendment, than in any other court of last resort. That court has passed upon these questions very frequently and - very recently in a number of celebrated and well-considered cases. One of the most recent cases is that of Rast v. Van Deman & Lewis Co., 240 U. S., 342, known as the Trading Stamp case.
Mr. Justice McKenna in his opinion in that case lays down the correct doctrine that has been generally followed by the United States supreme court, and most of the state courts. The lower courts in the trading stamp cases had held that the use of coupons, or trading stamps, was only a mode of legitimate advertising, and that no dis *39 tinction could be made as between business men who used such trading stamps and the business men who did not use such trading stamps.
. Mr. Justice McKenna upon that point, at page 357, uses this language:
“The difference between a business where coupons are used, even regarding their use as a means of advertising, and a business where they are not used, is pronounced. Complainants are at pains to display it. The legislation which regards the difference is not arbitrary within the rulings of the cases. It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed, Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78. It makes no difference that the facts may be disputed or their, effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety. Chi., Burl. & Q. R. R. Co. v. McGuire, 219 U. S. 549; German Alliance Ins. Co. v. Kansas, 233 U. S. 389, 413, 414; Price v. Illinois, 238 U. S. 446, 452.
“It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury but obstacles to a greater public welfare. Eubank v. Richmond, 226 U. S. 137, 142; Sligh v. Kirkwood, 237 U. S. 52, 59. And, we repeat, ‘it may make discriminations if founded on distinctions that we cannot pronounce unreasonable and purely arbitrary.’ Quong Wing *40 v. Kirkendall, 223 U. S. 59, 62, and the cases cited above.”
This same doctrine as to classifications and exemptions is reviewed and reaffirmed by Justice McKenna in the Geiger-Jones case, supra, where he quotes from the briefs of counsel for the Geiger-Jones Company, specifying a large number of discriminations urged against the statute wherein the statute undertakes to classify those who are within the statute and those who are exempt from the statute. Upon this question Justice McKenna says: *
“We cannot give separate attention to the asserted discriminations. It is enough to say that they are within the power of classification which a State has. A State ‘may direct its law against what it deems an evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. * * * If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law.’ Central Lumber Co. v. South Dakota, 226 U. S. 157, 160. The cases were cited from which those propositions were deduced. To the same effect is Armour & Company v. North Dakota, 240 U. S. 510, 517.”
This same doctrine is decisive of the case at bar *41 upon the matter of classifications and exemptions in the Loan Law act.
The chief objection to the act, and the most serious one, is that touching the revocation of the license. Section 6346-2 provides:
“The said superintendent of banks may revoke any license, if the licensee, his officers, agents, or employes shall violate any of the provisions of this act.”
No provision is expressly made for any hearing before the superintendent of banks, or for any notice to the licensee as to such hearing, nor is any provision made for attendance of witnesses. Neither is there any provision made for any appeal or review of the action of the superintendent of banks touching any revocation of a license. Manifestly, if any licensee were found guilty of violating any of the provisions of this act in a proper proceeding before a court of competent jurisdiction, such adjudicated violation would doubtless warrant the revocation of a license. But whether or not, independent of any such adjudication, the superintendent of banks is constitutionally authorized to revoke such license upon his own discretion, it is unnecessary here to determine. That question cannot be raised in this case.
Plaintiff in error has refused to apply for a license. He has ignored the act as a whole and refuses to recognize its force and effect as a whole. The question of the constitutional revocation of a license cannot be raised until a license' has been first granted under the provisions of this act. Upon presentation of such case it will then be *42 proper for this court to consider and determine that question.
In so far as the act in question is involved in this case the same is held to be a valid act within the police power of the state and not prohibited by any provision of the Constitution of the United States.

Judgment affirmed.

Nichols, C. J., Johnson, Donahue, Newman, Jones and Matthias, JJ., concur.