[Civil No. 4432. Filed February 2, 1942.]

[121 Pac. (2d) 640.]

LUIS GARCIA and MARIA GARCIA, His Wife, and CHABELLO GARCIA, Also Known as ISABEL GARCIA, Appellants and Cross-Appellees, v. D. W. SUMRALL and G. L. SUMRALL, Appellees and Cross-Appellants.

528

Mr. Harry O. Juliani and Mr. William I. Martin, for Appellants and Cross-Appellees.

Mr. Lesley B. Allen, for Appellees and Cross-Appellants.

LOCKWOOD, C. J.—This is an action by D. W. and G. L. Sumrall, plaintiffs, against Luis Garcia, Maria Garcia, his wife, and Chabello Garcia, defendants, to recover damages for an alleged willful trespass by defendants upon the lands of plaintiffs. A verdict was rendered in favor of plaintiffs in the sum of $5,500. The court, upon motion for new trial, ordered that the same be denied on condition that plaintiffs would remit $1,500 from the verdict, which was done, and judgment was rendered, whereupon defendants appealed.

The facts necessary for a determination of the case may be stated as follows: Plaintiffs for many years had been engaged in the business of raising goats upon the open range in Pima County, Arizona. On January 27, 1937, they received a lease under what is commonly known as the Taylor Grazing Act, 43 U. S. C. A. § 315 et seq., from the United States government, covering sections 5, 6 and 7, township 12 south, range 9 east, and all of the north half of township 12 south, range 8 east, excepting the west half of section 13 and the east half of section 14, which exception we shall hereafter refer to as the Myers claim. A large portion of the north half of township 12, *supra,* lay within the boundaries of certain patented mining claims belonging to the American Smelting & Refining Co., and was particularly adapted to the pasturing of goats, being hilly land with a heavy growth of weeds and brush.

The lease from the government was for a period of one year, and before its expiration plaintiffs duly made application for its renewal, but on account of various delays the renewal was not formally granted until December 10, 1938, when a new lease for five years, covering the same land as the first lease, was delivered to plaintiffs. During the interregnum, however, they remained in possession of the land, no attempt being made by the government to terminate such possession in any manner, and during all the time from the beginning of the first lease up to the commencement of this action, they continuously pastured a large number of goats on the leased premises. During 1933, one Charles D. Myers, upon finding that the north half of township 12 south, range 9 east, *supra,* was unsurveyed, made a settlement entry and claim upon the land which we have described as the Myers claim. He took up a residence upon the land,

placed certain improvements thereon, and continued to reside there until January, 1937, when he died testate, naming his brother Edwin F. Myers as his sole beneficiary. The federal government recognized this claim and refused to include it in the land leased to plaintiffs.

Defendants for many years had been engaged in the cattle business in Pima County, Arizona, their home ranch being some six or eight miles to the southeast of the Myers claim, where they ran a considerable number of cattle. Shortly after Myers' death, they moved onto the Myers claim and converted his improvements into headquarters and a water supply for certain cattle which they had brought to, and turned loose upon, said claim. According to plaintiffs' witnesses, the number of cattle which defendants brought to the Myers claim was much greater than the land would ordinarily carry for grazing purposes. This, however was denied by defendants.

It is a well known fact, of which this court may take judicial notice, that cattle placed upon an open range of this nature, when the feed or water thereon becomes insufficient, will naturally and by instinct drift in all directions in search of feed and water. The south half of township 12 south, range 8 east, was Indian reservation land, and there was a fence along its north and east side, which prevented the cattle on the Myers claim from drifting to the south. The Myers claim, when defendants first occupied it, was thus open on the north, east and west, and surrounded on those sides by land contained within the lease above referred to. This leased land to the east, however, was only half a section in width, but to the north and west covered several thousand acres. Some distance north of the Myers claim the

ground became very rocky and precipitous, and of such a nature that cattle would not readily climb thereon or cross it. Defendants built a fence tied to the Indian reservation fence on the south, and running in a northerly direction along the east boundary of the Myers claim and for a distance beyond its northeast corner. Defendants testified this extension was but a few feet and made only for an anchorage, while plaintiffs' witnesses described it as from a quarter to half a mile in length and extending to the rocky ground above described. If the extension was as described by these last witnesses, the natural and, indeed, practically inevitable result of this fence was to prevent the cattle on the Myers claim from drifting back to the east and to compel them, when feed or water was exhausted on the Myers claim, to wander upon the leased land of plaintiffs to the north and northwest.

On May 25, 1940, plaintiffs filed this action, alleging in substance as follows: They set up their leases as aforesaid, and that they had continuously held gazing rights upon the land since January 27, 1937, ranging their goats thereon. While they were so doing, defendants entered upon Myers claim, converting the improvements into headquarters for carrying on the cattle ranching business, installing a pumping equipment and reservoirs thereon, and constructed the drift fence as above referred to, and drove a large herd of cattle upon the Myers claim and the lands of plaintiff to the west thereof. Shortly after the cattle were so placed, and as soon as plaintiffs had knowledge thereof, they advised defendants of their leases and that the latter were trespassing upon the rights of plaintiffs in building the drift fence and in pasturing the cattle upon the lands. Notwithstanding such warning and advice, "the said defendants have con-

tinued since July, 1937, to at all times place, herd, control, maintain and pasture upon the said lands a large number of cattle and horses, controlling their movements in such manner as to retain them upon and to cause them to secure all of their pasturage upon the said lands so held by plaintiffs.''

It was further alleged that the effect of the conduct of defendants as above set forth was to destroy the pasturage of plaintiffs for many years on not less than fifteen sections of the leased land, and that the lack of pasturage thereon caused by defendants' act had caused the death of not less than four hundred of plaintiffs' goats. The damages claimed were $8,000 general and special damages, and $2,000 exemplary damages.

At the trial evidence was introduced, which the jury could have believed showed that the conduct of defendants in building the drift fence, as aforesaid, extending beyond the Myers claim upon the leased ground of plaintiffs, was intended to, and did, have the effect of preventing defendants' cattle from drifting back to the east to the range from whence they came, and forcing them, as feed became short, to wander out upon the premises of plaintiffs, and that defendants had committed other unlawful acts which were intended to, and did, have the same effect. Most of the alleged unlawful acts, and all of plaintiffs' inferences as to their results and defendants' intent, were denied by the latter.

This is sufficient to give a general picture of the situation and the theory of plaintiffs' action and the defense. We shall refer to specific details of the testimony as from time to time may become necessary. We consider then the questions raised upon the appeal.

Defendants moved to dismiss the complaint on the ground that it appeared upon its face that it was barred by the statutes of limitation, and that it did not state a cause of action. There is considerable discussion in the briefs as to whether these two issues were properly raised, but since it will be necessary to rule on them before a final determination of the controversy may be had, we will assume, without specifically so deciding, that the method followed did properly present the plea of the statutes of limitation and the objection that the complaint did not state a cause of action.

First as to limitations. The complaint was filed May 25, 1940, and states that the trespass began July 1, 1937. The action of trespass is barred by our statutes within two years. Section 29–202, Arizona Code 1939. But it is held that where a trespass is continuing in its nature, if the action be brought at any time within two years of the last trespass, it is good and damages may be recovered for all of the statutory period prior to the commencement of the action. *Henshaw* v. *Salt River Valley Canal Co.,* 9 Ariz. 418, 84 Pac. 908. The complaint did not show on its face that the action was barred by the statutes of limitation. Defendants, however, claim that even if this be true, plaintiffs had no right to the premises from the time of the expiration of their first lease on January 27, 1938, up to December 10, 1938, when the new lease was given by the government and, therefore, had no right to recover damages for any of that period. It is their theory that at the expiration of the first lease plaintiffs lost all rights of every nature to the premises until such time as the new lease was delivered by the federal government.

It is the position of plaintiffs, on the other hand, that they were tenants from month to month

after the expiration of their lease, and that their possession was good as against everyone except the landlord. It is, of course, true as a general thing that the United States may adopt such laws as it pleases regarding the use of lands owned by it within the boundaries of a state, and may prescribe the manner in which others may acquire rights therein. *Utah P. & L. Co.* v. *United States,* 243 U. S. 389, 37 Sup. Ct. 387, 61 L. Ed. 791; *Brooks* v. *Dewar,* 313 U. S. 354, 61 Sup. Ct. 979, 85 L. Ed. 1399. It does not, however, follow that because the United States did not affirmatively issue to plaintiffs a renewal of their lease or a temporary permit immediately upon the expiration of the first lease, that plaintiffs in an action in the state courts, to which the United States was not a party, will be held to have no rights in the premises. We are of the opinion that under such circumstances the situation is governed by the law of the state, and it cannot be doubted that under our law plaintiffs were tenants from month to month during that period, and entitled to the possession of the premises as against anyone but the United States government. Section 71–305, Arizona Code 1939.

The second question is as to the right of plaintiffs to maintain an action of trespass under the facts alleged in the complaint. It is the position of defendants that by reason of the provisions of sections 50–601 to 50–606, Arizona Code 1939, the action of trespass, as applied to the trespass of livestock, is abolished so far as unenclosed land not lying within an incorporated city or town or within a no-fence district, is concerned. Under the common law it was presumed to be the duty of the owners of animals to keep the same properly enclosed and under control, and if they failed to do so and the animals trespassed upon the property of another, fenced or unfenced, the

owners of the animals were liable for damages. This rule, however, has been greatly modified in America, and particularly in what is commonly referred to as the grazing states. The situation in these states may be briefly stated as follows:

 A very large percentage of the land therein is owned by the United States government, only an extremely small portion being under private ownership. Much of this land is valuable only for the pasturage of neat animals. The federal government for many years recognized the custom existing of allowing such animals to run at large upon the land and acquiesced therein, but forbade its enclosure by fences. The result was that if the old common law rule of trespass was applied, it would have been practically impossible to use these federal lands for grazing, for the animals running at large thereon, due to their natural instincts, would be practically certain to trespass upon any privately owned lands lying adjacent to the open range. For this reason many, if not most, of the western states adopted statutes similar to ours above referred to. The obvious purpose and effect of these statutes was to change the common law rule and to make the owner of private premises fence his land to keep animals out, rather than to compel the owner of the animals to fence the land upon which they were grazing in order to keep them in. But notwithstanding this, it was practically universally held in the states having such laws that they did not have the effect of permitting those grazing animals upon the public domain to commit acts of willful trespass by deliberately and intentionally causing their animals to trespass upon private property. *Lazarus* v. *Phelps*, 152 U. S. 81, 14 Sup. Ct. 477, 38 L. Ed. 363; *Bell* v. *Gonzales*, 35 Colo. 138, 83 Pac. 639, 117 Am. St. Rep. 179, 9 Ann. Cas. 1094; *Chilcott* v. *Rea*,

52 Mont. 134, 155 Pac. 1114; *Martin* v. *Platte Valley Sheep Co.*, 12 Wyo. 432, 76 Pac. 571, 78 Pac. 1093.

A number of actions arose involving this question and this rule was followed in all cases, but when it came to a question of what constituted a willful trespass, a sharp divergence appeared. In some jurisdictions it was held that one who released animals upon either the open range or his own premises under such circumstances he knew or should have known that the natural and probable result would be that the animals would wander upon other private premises, was, merely by reason of his knowledge of such fact and intention to profit thereby, guilty of willful trespass. *Lazarus* v. *Phelps, supra; Vanderford* v. *Wagner*, 24 N. M. 467, 174 Pac. 426; *Mower* v. *Olsen*, 49 Utah 373, 164 Pac. 482.

In other states, however, this was considered too drastic a rule and one that would nullify the effect of the statutes of the class above referred to. In *Richards* v. *Sanderson*, 39 Colo. 270, 89 Pac. 769, 771, 121 Am. St. Rep. 167, it was said:

" . . . One who turns his cattle out to graze unrestrained upon lands where he has a right to turn them, knowing that they will probably wander on the uninclosed premises of another, is under no obligation to prevent them entering upon such premises, and, if they do so enter through following their natural instincts, he is not responsible for the damages occasioned thereby. *Martin* v. *Platt Valley Sheep Co., supra.* This proposition is clearly applicable to the case of one who does no more than turn his cattle upon the public domain to graze, even though he knows that, following their natural instincts, they may wander upon the uninclosed lands of his neighbor. The plaintiff did turn his cattle upon public domain in the near vicinity of lands belonging to the defendants. One half of the territory from which they were driven either belonged to the plaintiff or was government land. The other half

belonged to the defendants. The plaintiff may have had good reason to believe that his cattle would wander upon the lands of the defendants. This would be natural for the cattle to do. The lands embracing the public domain and that of the defendants were alternate sections, covering a large area. He had a right to place them on the public domain or his own land; was under no obligation to restrain them from going upon the lands of the defendants; and therefore he would not be responsible to the latter if they did. Such a case is entirely different from those cited by counsel for defendants, where it appears that the owner of stock willfully pastured it upon lands belonging to another, either by driving or herding thereon."

This rule has been consistently followed in Colorado ever since, and the same rule prevails in Wyoming. *Bolten* v. *Gates,* 105 Colo. 571, 100 Pac. (2d) 145; *Williamson* v. *Fleming,* 65 Colo. 528, 178 Pac. 11; *Martin* v. *Platte Valley Sheep Co., supra.*

We think the rule laid down by the Colorado and Wyoming cases is more consonant with the situation prevailing in the grazing states and with our statutes above referred to, and we hold, therefore, that the mere knowledge or expectation by one who turns cattle loose in a place where he has a right to release them that they may or probably will wander upon the lands of another, or that he overstocks his own land so that the same effect may be produced, is not alone sufficient to constitute willful trespass. There must be some overt and unlawful act on the part of a defendant which tends to increase the natural propensity of cattle to wander and to direct them upon the premises of another.

The allegations of the complaint are that defendants did "place, herd, control, maintain and pasture their animals upon plaintiffs' land," and we think this is sufficient, if sustained by the evidence, to

state an action in willful trespass. The trial court, however, gave the jury the following instruction:

"You are further instructed that an owner of cattle is held at law to intend the natural and probable consequences of his acts, and if he turns his cattle loose under circumstances in which it is natural and probable that they will enter upon and graze upon the lands of others, the owner of such cattle is liable in trespass to the same extent as if he had herded and driven the cattle onto such lands; . . . "

This is a plain and direct statement that under the law of Arizona if one turns his cattle loose "under circumstances in which it is natural and probable that they will enter upon and graze upon the lands of others," he is liable for willful trespass, even though he has done nothing unlawful to aid or accentuate the natural propensities of the animals to wander. This is not the law of Arizona and undoubtedly would have the tendency to mislead the jury, for it might well have found from the evidence that the defendants knew that the natural and probable consequence of turning cattle loose upon the Myers claim would be that they would trespass upon plaintiffs' lands, but that they took no direct measure to induce such trespass, and yet, under the instruction, would be liable therefor. It is true that the court thereafter correctly charged that if defendants were guilty of certain overt acts set forth in the instructions, they would also be guilty of a willful trespass, but we think since the evidence as to these overt acts was in sharp conflict, the erroneous instruction above given was not cured by the court's instruction which followed.

It is not necessary for us to discuss any of the other alleged errors, for if any occurred they will doubtless be corrected upon a new trial.

Since the court erred in instructing the jury upon the fundamental law of range trespass, it is necessary that the judgment be set aside and the case remanded for a new trial. It is so ordered.

McALISTER and ROSS, JJ., concur.