George E. BARRETT et al.

v.

Robert KUNZIG, as Administrator, General Services Administration, et al.

Civ. A. No. 6193.

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 11, 1971.

George E. Barrett, Lionel R. Barrett, Jr., Carlton H. Petway, Nashville, Tenn., Charles Morgan, Jr., American Civil Liberties Union, Norman Siegel and Morris Brown, Atlanta, Ga., Philip M. Carden, Nashville, Tenn., for plaintiffs.

William R. Willis, Jr., Nashville, Tenn., for Tennessee Bar Ass'n, intervening plaintiff.

Charles H. Anderson, U. S. Atty., Joe B. Brown, Asst. U. S. Atty., Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

MORTON, District Judge.

This is a suit to enjoin the continued execution of a system of inspection of packages and briefcases carried into the United States Courthouse at Nashville, Tennessee by the security force of General Services Administration.

The original plaintiffs consisted of attorneys, a client, and a spectator. The Tennessee Bar Association was permitted to intervene as a plaintiff. The plaintiffs assert that the action, in addition to asserting their individual rights, is brought under Rule 23 of the Federal Rules of Civil Procedure as a class action representing: (1) attorneys who practice in the United States Courthouse, (2) attorneys who are members of the Tennessee Bar Association, (3) persons who are presently litigants in suits in the U. S. District Court at Nashville, and (4) persons who desire to attend trials as spectators.

As to proposed spectators at trials in the United States Courthouse, the Court does not find that the plaintiff spectator in this case will fairly and adequately protect the interest of all spectators. In addition, the plaintiff has not shown a need for the existence of a class of spectators as distinguished from any person entering the building in order to use its facilities.

As to the Tennessee Bar Association, membership in that organization does not automatically qualify the attorney to practice in the federal courts of the Middle District of Tennessee. Certain procedures, not formalities, are conditions precedent to admission to practice in said U. S. District Court. Therefore, the Court finds that the Tennessee Bar Association and its members are not proper parties to this cause, and are not representative parties of any class or subclass material to the litigation.

Thus, the Court dismisses this cause as to said plaintiff Tennessee Bar Association, and also determines that there is no spectator class. In addition, this Court is not required to pass on the issue of whether the individual spectator has standing to sue, since such determination is preempted by the Court's decision on the merits.

The attorneys who practice in the U. S. District Court for the Middle District of Tennessee are listed by name on the Bar Docket or roll of attorneys as part of the permanent court records. Their identity is readily ascertainable. The prerequisites of a class as set forth in Rule 23(a) and 23(b) (2) have, in this Court's opinion, been met. The Court determines that this action is maintainable as a class action as to such attorneys.

The persons who are litigants in the U. S. District Courts at Nashville are identifiable from the records of the Court. However, in view of the evidence presented in this cause, the Court cannot find that the plaintiff litigant can fairly and adequately protect the interest of all litigants. Therefore, this

action is not maintainable as a class action as to such litigants.

## BACKGROUND

The United States Courthouse in Nashville, Tennessee, owned by the United States of America, is supervised and operated by the General Services Administration, a division of government created by Congress.

The courthouse is an eight-story structure, approximately one block long and one-half block wide, housing two senators, their staff, one congressman, his staff, two circuit judges of the Sixth Circuit Court of Appeals, their staff, two district judges, their staff, the United States Clerk's Office, the United States Attorney, his staff, the Internal Revenue Service, the Veterans Administration, the Federal Bureau of Investigation, and additional governmental agencies. In short, many hundreds of persons are housed in the building. Two district judges regularly hold court in the building.

Due to bomb threats, bombings, forced entry, and disturbances, G.S.A. decided to initiate certain protective procedures in all large government buildings under their supervision and, in particular, those housing federal courts.

Evidence was introduced in this cause as to the number of bomb threats in this general area of the country and the number of forcible entries. In addition, evidence was received as to bombings in other areas of the country. On one occasion, the holding of court in this building was suspended because an unruly crowd congregated in the hallways of the building adjacent to the courtroom, was disruptive, and refused to disburse after orders from the Court. Thus it was necessary to adjourn court.

As an indication of occurrences in this country, we quote from the case of In re Trials of Pending and Future Criminal Cases, 306 F.Supp. 333 (N.D.Ill.1969):

"(a) On September 19, 1969 a bomb caused an explosion at the Federal Office Building in New York causing damage in excess of $500,000.

"(b) On September 26, 1969 a bomb caused an explosion at our neighboring District, The United States Courthouse and Federal Building in Milwaukee, Wisconsin, causing damage estimated at $75,000.

"(c) On September 26, 1969 a bomb caused an explosion on federal property at the National Guard Armory, Madison, Wisconsin, causing damage estimated at $25,000.

"(d) On September 25, 1969 a briefcase containing 17 sticks of dynamite and a timing device was planted in the Civic Center Building and Cook County Courthouse, Chicago, Illinois on a floor immediately below the State Supreme Court Justices' Chambers.

"(e) On October 6, 1969 an explosion occurred at the Haymarket Square statue located in Chicago, Illinois." 306 F.Supp. 333, 337.

Since the above case, a California judge was slain and the United States Capitol was bombed.

## IMPLEMENTATION OF REGULATIONS

With the above background, the G.S.A. under its regulations, 41 CFR 101–19.3, et seq. (November 5, 1969) set in motion a procedure of inspection. The pertinent portions of these regulations are:

"5. CONFORMITY WITH SIGNS AND EMERGENCY DIRECTIONS. Persons in and on property shall comply with official signs of a prohibitory or directory nature, and, during emergencies, with the direction of authorized individuals.

\*　　\*　　\*　　\*　　\*　　\*

"14. WEAPONS AND EXPLOSIVES. No person while on

property shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes." Record, Exhibit A.

By communication with their Nashville building manager, G.S.A., effective June 15, 1971, issued instructions to its security personnel:

"During hours when the building is open, (7 AM to 5 PM), persons entering the building with briefcases, packages, etc. will be required to show ID cards or have their packages inspected."

Two large, plainly visible signs were placed at the front and rear entrances of the building (the only means of ingress and egress available) with the following wording:

---

### NOTICE

### OPEN ALL PACKAGES, BRIEFCASES, ETC. FOR INSPECTION AT INSP. STATION

An inspection station (a desk or counter arrangement) was located within the lobby and the above sign was also prominently displayed at the front of this location.

The proposal to make such inspections was given wide publicity in the local newspapers as early as June 13, 1971.

Thus alerted that the inspections would be initiated on June 15, 1971, the original plaintiffs prepared for their confrontation by typing their complaint on or before June 14, 1971. The confrontation took place at 8:55 a. m. on June 15, 1971, and this suit was filed immediately thereafter.

### THE CONFRONTATION

At 8:55 a. m. on June 15, 1971, attorney George Barrett appeared at the inspection station with his briefcase. Photographers were present. On being requested to open his briefcase for a visual inspection, he refused to do so. He did not, at first, identify himself as an attorney. Later he did so. He advised the security guard that he was appearing for a defendant in a criminal case in the court of a district judge in the building at 9:00 a. m. He demanded to be able to proceed without any inspection of his briefcase.

The plaintiff George Barrett was given three options: (1) open his briefcase for a visual inspection; (2) leave the briefcase in the custody of an attendant and proceed into the building; or (3) carry the briefcase with him without inspection, but be accompanied by a security guard.

Other attorneys testified as to their respective confrontations. Their testimony was largely cumulative.

The plaintiffs contend that the inspection procedures infringe their individual rights and those of their clients whom they represent in the federal district courts. These infringements allegedly arise under the First, Fourth, Fifth, Sixth, and Ninth Amendments to the United States Constitution.

### THE INSPECTION PROCEDURE

Any person, including plaintiffs, who enter the United States Courthouse carrying packages or briefcases are requested to open the same for visual inspection. It is uncontroverted that the inspection is made to determine if such objects contain firearms or explosives. It is uncontroverted that the inspectors (guards) do not read the contents of the briefcases or packages. It is uncontroverted that the inspection is a cursory visual inspection. No allegation is made and no contention expressed that any packages or briefcases left in custody of the guards are opened or inspected.

The packages and briefcases of all persons who enter the building, except those who work there and have been issued special identification cards, are inspected. The briefcases of the United States Judges are regularly inspected.

The term "search" has been used by the plaintiffs. To the extent that term is applied to more than a casual visual

inspection, it has no meaning and is without foundation in this record.

## DISCUSSION

The Court considers the following items to be determinative of the issues: (1) the building belongs to the United States Government; (2) the inspection is a casual visual inspection for the protection of the property of the United States of America, its employees and persons lawfully in the building; and (3) there are several reasonable alternatives available to an inspectee, the plaintiffs in this case.

*The United States as a Property-owner.*

■ Article I, Sec. 8 and Article IV, Sec. 3 of the United States Constitution clearly recognize the right of the government to own, use and control property.

The second sentence of Article IV, Sec. 3 of the United States Constitution provides:

"The Congress shall have Power to dispose of and *make all needful rules* and regulations respecting the Territory or other property belonging to the United States; * * *." (Emphasis supplied.)

By virtue of the authority of 40 U.S. C. § 318 et seq., Congress delegated to G.S.A. the right to establish regulations governing the operation, use, maintenance and protection of the United States Courthouse at Nashville, Tennessee. This delegation by Congress has been sustained as constitutional. United States v. Cassiagnol, 420 F.2d 868 (4th Cir. 1970), cert. denied 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970).

General Services Administration properly published its regulations and under these provisions established the presently challenged inspection procedure.

It is pertinent to note that this is not an instance of a police or governmental agent invading the home, premises or property of an individual, nor is it an instance involving the benefits of any potential evidence which might be disclosed by the cursory inspection. Further, it is essential to emphasize that this is not a "stop and frisk" on the public streets and it is not interrogating in nature nor does it occur under color of arrest attendant to the inspection.

It is necessary to determine what constitutional limitations are imposed on the United States, as a property owner, where it requires those who enter its premises to consent to a casual visual inspection of containers for weapons and explosives.

To define the rights of the United States as a property owner we look to a series of cases which are uniform in their holdings.

"It is settled that: 'With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations.' Gibson v. Chouteau, 1871, 13 Wall. 92, 99, 80 U.S. 92, 99, 20 L.Ed. 534; cf. Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 405, 37 S.Ct. 387, 61 L.Ed. 791; Oman v. United States, 10 Cir., 1952, 195 F.2d 710; Garcia v. Sumrall, 1942, 58 Ariz. 526, 121 P.2d 640.

"It is also beyond question that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers.' Camfield v. United States, 1897, 167 U.S. 518, 524, 17 S.Ct. 864, 866, 42 L.Ed. 260." United States v. West, 232 F.2d 694, 698 (9th Cir. 1956).

"While the lands in question are all within the State of Colorado, the Government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers. *It may deal with such lands precisely as a private individual may deal with his farming property*. It may sell or withhold them from sale. It may grant them in aid of railways or other public enterprises. It may open them to pre-emp-

tion or homestead settlement; but it would be recreant to its duties as trustee for the people of the United States to permit any individual or private corporation to monopolize them for private gain, and thereby practically drive intending settlers from the market. It needs no argument to show that the building of fences upon public lands with intent to enclose them for private use would be a mere trespass, and that such fences might be abated by the officers of the Government or by the ordinary processes of courts of justice. To this extent no legislation was necessary to vindicate the rights of the Government as a landed proprietor." Camfield v. United States, 167 U.S. 518, 524, 17 S.Ct. 864, 866, 42 L.Ed. 260 (1897). (Emphasis supplied.)

"In developing these projects the United States is expending federal funds and acquiring federal property for a valid public and national purpose, the promotion of agriculture. This power flows not only from the General Welfare Clause of Art. I, § 8, of the Constitution, but also from Art. IV, § 3, relating to the management and disposal of federal property. As this Court said in United States v. San Francisco, 310 U.S. 16, 29–30, 60 S.Ct. 749, 84 L.Ed. 1050, 1059, 1060 (1940), this *'power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine." '* See also United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889, 1893 (1947), and Alabama v. Texas, 347 U.S. 272, 273–274, 74 S.Ct. 481, 98 L.Ed 689, 693, 694 (1954).

*"Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges.* See Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), and Federal Power Com. v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952)." Ivanhoe Irrig. Dist. v. McCracken, 357 U.S. 275, 294, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958). (Emphasis supplied.)

"Article 4, § 3, Cl. 2 of the Constitution provides that 'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States.' The power over the public land thus entrusted to Congress is without limitations. 'And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.' Thus, Congress may constitutionally limit the disposition of the public domain to a manner consistent with its views of public policy." United States v. San Francisco, 310 U.S. 16, 29, 30, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940).

■ Thus it would seem clear that the United States Government and its custodian, General Services Administration, could make use of its property as could any private citizen with his home. Hence, it could prevent entry or make such conditions as it deemed proper as a precedent to entry.

Once the United States had located offices and courts in its property and issued invitations for the public to enter, has it completely given up its right to protect itself, i. e., its property and employees? Stated in another way, may the government make the right of entry on its property conditional, i. e., on a casual visual inspection of packages, etc.? Reduced to an absurdity, is the United States helpless in protecting its property once it has been opened for the public use?

Since historically the right of the United States to regulate the use of its property has been accepted, there is a dearth of judicial precedents. However, by analogy we have the immigration border search cases, which have been uni-

versally upheld.[1] In addition, there are the military installation and naval base cases. For example, the concept of these cases is that the Constitution conferred on the President the power of Commander-in-Chief and it conferred on Congress the right to maintain a navy. In addition, Congress has the power to regulate and the President approves the regulations. Again keeping in mind that we are discussing property owned by the United States and not property owned by a private citizen, the cases are uniform in that: (1) regulations, much more stringent than those in the instant case, are reasonable; and (2) the power of the commanding officer under such regulation is supreme "in light of the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command." Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

> "Moreover, the governmental function operating here was not the power to regulate or license, as lawmaker, an entire trade or profession, or to control an entire branch of private business, but, rather, as proprietor, to manage the internal operation of an important federal military establishment. See People v. Crane, 214 N.Y. 154, 167–169, 108 N.E. 427, 431–432, L.R.A.1916D, 550 (per Cardozo, J.); cf. Perkins v. Lukens Steel Co., 310 U.S. 113, 129, 60 S.Ct. 869, 84 L.Ed. 1108, 1115. In that proprietary military capacity, the Federal Government, as has been pointed out, has traditionally exercised unfettered control." Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961).

Of further interest is the holding in Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), involving a trespass statute of the state of Florida. Certain protesting students had gone to the county jail to demonstrate against alleged discrimination. After refusal to depart, they were arrested and convicted of trespass. In the appeal to the United States Supreme Court, they asserted that their conviction denied them "rights of free speech, assembly, petition, due process of law and equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States." Adderley v. Florida, *supra*, at 41, 87 S.Ct. at 244.

In deciding this case, the Court pointed out that traditionally, state capitol grounds are open to the public, but that jails built for security purposes are not.

It would seem elementary that a citizen who had legitimate business in a jail, i. e., a lawyer visiting a client, could gain access to it so long as he obeyed reasonable rules and regulations. Certainly an attorney could not insist on taking into the jail with him uninspected packages, concealed weapons and explosives.

We quote from *Adderley* as follows:

> "For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful civil rights demonstration was not only "reasonable" but also particularly appropriate * * *.' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, Cox v. Louisiana, supra, 379 U.S. [536] at 554–555 and 563–564, 85 S.Ct. [453] at 464 and 480, 13 L.Ed.2d [471] at 484 and 491, 492. We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."

---

1. **77 Yale L.J. 1007, et seq.**

Adderley v. Florida, 385 U.S. 39, 47, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ It is the opinion of this Court that the United States as a property owner can control entrance to its property by conditioning the entrant's right of entry on his submitting his packages and briefcase to a visual inspection.

*Constitutional Issues.*

Assuming, however, that the United States does not have this property right, would such casual visual inspection under the present G.S.A. procedures infringe any constitutional rights of the entrant? If so, would the protection of any interest in the general welfare outweigh the infringement upon the individual's constitutional rights?

It should be noted at the outset that (1) the entrant has prior notice of the intended inspection, and (2) the entrant has three options, i. e., permit the inspection, deposit his briefcase for safekeeping, or permit a guard to accompany him to his destination.

■ The guards are unobtrusive and the inspection lacks the quality of insult felt by an individual in his own home or on the public street who is stopped and searched. When the interest in protection of the government property and personnel from destruction is balanced against any invasion to the entrant's personal dignity, privacy, and constitutional rights, the government's substantial interest in conducting the cursory inspection outweighs the personal inconvenience suffered by the individual. Furthermore, the persons whose packages are inspected generally fall within a morally neutral class. Because everyone carrying the enumerated parcels is required to have them inspected, the inspection is not accusatory in nature and the degree of insult to the entrant's dignity is minimal. Thus it cannot be said that a finger of suspicion is unfairly or arbitrarily being pointed at an individual as falling within a "highly selective or inherently suspect" group.

See California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).

■ The Fourth Amendment to the Constitution prohibits "unreasonable searches." But does it prohibit the government from conducting in its buildings casual eye inspections of an individual entrant's packages or briefcases to determine if guns or explosives are present? Can this inspection in light of the interest it seeks to protect be so offensive, or overly broad so as to offend the guarantees of the Fourth Amendment and constitute an "unreasonable" search? This Court thinks not.

The alleged violations of the First Amendment are determined by the holding of the Supreme Court in the case of Adderley v. Florida, *supra.* Thus this Court feels no further discussion is necessary on this contention.

■ The inspection of the packages and briefcases does not violate the right against self-incrimination secured by the Fifth Amendment. The attorney-client privilege is not violated because the inspection is cursory in nature and the contents of the parcels are not read. In addition, where the entrant is given the three options mentioned above, under two of the options he can effectively circumvent consenting to even opening his packages under the guise of inspection.

■ The plaintiffs also assert that the Sixth Amendment is violated since they have been appointed counsel for defendants charged with a crime. They assert that the visual inspection of packages and briefcases for firearms and explosives is an infringement of this right. It is true that a defendant is guaranteed counsel. However, the cursory inspection at issue here does not infringe upon effective representation of a client by counsel. No restriction on representation of a client or any prying into confidential matters is involved here.

■ Emphasis at trial was directed to the fact that the purses of women are not inspected, even though some of the purses are quite large. Since no purses

(men's, women's, or children's) were inspected, this Court sees no discrimination involved. Certainly the restriction eliminating the search of a purse, personal to an individual, mitigates the intrusion rather than enhances it.

This Court is not required to and does not pass upon the admissibility of any evidence or violations of the law by reason of the inspection in any subsequent criminal prosecution.

The Court, in light of the aforementioned options, does not feel compelled to determine whether the plaintiffs gave uncoerced consent to the casual visual inspection of their packages and briefcases.

Since the Court finds that the most serious questions were presented in the cases of the plaintiffs' attorneys, the opinion is so phrased. However, the principles announced have equal application to all the plaintiffs and are dispositive of their claims.

For the foregoing reasons, the request for injunction is denied and the case is dismissed.